NATIONAL SURETY CO. v. MURPHY-WALKER CO. (No. 384.)

(Court of Civil Appeals of Texas. El Paso. March 4, 1915. Rehearing Denied April 1, 1915.)

1. INSURANCE ☞146—CONSTRUCTION OF CONTRACT—FIDELITY OR GUARANTY BOND.

Contracts of a surety company, indemnifying an employer against the dishonesty of employés, entered into for a premium paid after investigation, based upon written representations relative to the extent of the risk, are not differentiated from guaranty insurance, and the same rules of construction must apply thereto as apply to other insurance contracts.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 292, 294–298; Dec. Dig. ☞146.]

2. STATUTES ☞113—CONSTITUTIONAL PROVISIONS—TITLE—"SUBJECT."

Const. art. 3, § 35, provides that no bill shall contain more than one subject, expressed in its title, but that if any subject embraced in an act is not expressed in its title, the act shall be void only as to subjects not so expressed. Acts 31st Leg. c. 108, not amendatory of any former legislation, is entitled "An act to authorize the incorporation of life, accident, and health companies, to regulate their business and that of foreign companies doing business in the state," etc., and section 55 thereof (Rev. St. 1911, art. 4955), provides that all the provisions of the laws applicable to life, fire, marine, etc., insurance companies, so far as applicable, shall apply to all companies transacting any other kind of insurance business in the state. Held, that the constitutional provision was mandatory, and intended to apprise the legislators of the contents of bills so as to prevent surprise and fraud, that the word "subject" as used therein meant that which was to be governed by the particular law, and that the title did not indicate its intended application to insurance companies other than those enumerated therein, so that it was ineffectual as to a surety company issuing fidelity or guaranty bonds.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 141–144; Dec. Dig. ☞113.]

For other definitions, see Words and Phrases, First and Second Series, Subject.]

3. STATUTES ☞145 — CODIFICATION — REENACTMENT.

Such invalidity was not relieved by its incorporation into Rev. St. 1911, art. 4955, without change, since under the bill to adopt and establish the Revised Civil Statutes, reciting, "Be it enacted by the Legislature of the state of Texas that the following titles, chapters and articles shall hereafter constitute the Revised Civil Statutes of the state of Texas," Final Title, § 16, declaring the statutes to be construed as a continuance of existing laws, and not as new enactments of the laws then in force, and Const. art. 3, § 43, providing that the first session of the Legislature thereunder should provide for revising and publishing the laws,

and that in the adoption and effect of such revision the Legislature should not be limited by sections 35 and 36, the latter of which provides that no law shall be revised or amended by reference to its title, but shall be re-enacted and published at length, there was no enactment or re-enactment so as to make it effective legislation and enlarge its application so as to apply to all insurance companies doing business in the state.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 214; Dec. Dig. ☞145.]

4. INSURANCE ☞285—ACTION ON POLICY—DEFENSES—STATUTES.

Under the express provision of Rev. St. 1911, § 4948, it is no defense to a suit on a surety or fidelity bond, construed as insurance, that misrepresentations were made in the application for the bond, unless the insurer shows that within 90 days after discovering their falsity it notified the insured that it refused to be bound thereby.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 657; Dec. Dig. ☞285.]

5. APPEAL AND ERROR ☞247—THEORY BELOW—ADHERENCE TO ON APPEAL.

Since under Rev. St. 1911, art. 4947, the falsity of answers or statements made in an application for a fidelity bond constitute no breach of contract on the part of the insured and no defense to his suit thereon, unless their materiality or contribution to the loss be shown at the trial, where it was not alleged in the answer that the answers and statements were material to the risk or actually contributed to the contingency which made the bond payable; the insurer cannot complain on appeal of the lack of evidence to support the court's finding that the misrepresentations were not material.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1426–1431; Dec. Dig. ☞ 247.]

6. INSURANCE ☞285—FIDELITY INSURANCE—APPLICATION OF STATUTES.

Rev. St. 1911, art. 4741, declaring that all policies shall provide that statements by the insured shall, in the absence of fraud, be deemed representations and not warranties, article 4947, providing that misrepresentations in any contract or policy of insurance must be material to avoid the contract or policy, article 4948, providing that no defense shall be based upon misrepresentations made in applications for policies or contracts unless defendant shows that, within 90 days after notice thereof, he notified the insured it would not be bound by the contract, article 4951, requiring policies of insurance to be accompanied by a copy of the questions asked in the application therefor, and article 4954, providing that the policy shall contain the entire contract, apply to surety or fidelity bonds.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 657; Dec. Dig. ☞285.]

Appeal from District Court, Presidio County; W. C. Douglas, Judge.

Action by the Murphy-Walker Company against the National Surety Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Jones, Jones & Hardie, of El Paso, for appellant. H. H. Kilpatrick, of Marfa, and J. F. Woodson, of El Paso, for appellee.

WALTHALL, J. This suit was brought by appellee, Murphy-Walker Company, against the appellant, National Surety Company, on a certain contract in writing, designated by various terms and expressions in the pleadings and briefs filed as "contract of insurance," "fidelity bond," "guaranty bond," but each designating that certain instrument given by appellant to appellee in the penal sum of $1,000 as indemnity against loss, which appellee, the employer of W. G. Lempert, might sustain by or through the personal dishonesty, amounting to larceny or embezzlement of said Lempert, in the performance of his duties in the position of cashier in the service of appellee, and which contract appellee alleged to be a policy of insurance. The appellee alleged a loss of $1,820.41, specifying the several items aggregating that sum, occurring within the time covered by the contract, alleged that said loss was covered by the terms of the contract, and prayed judgment for the sum of $1,820.41, as the damages sustained, and for interest and costs. The appellant presented general and special exceptions to the petition, and answered, denying that appellee had suffered any loss through dishonesty of Lempert, amounting to larceny or embezzlement; traversed each of the allegations in the petition, except those admitted, putting them in issue. The answer specially pleaded as defense to the action matters claimed to be conditions precedent in the nature of certain questions and answers, and which appellant alleges to be untrue, and other express conditions which appellant alleges to be express warranties and assurances, affirmative and promissory, and made for the purpose of inducing the execution of the contract, all of which appellant alleges appellee failed to comply with and carry out, and that in said matters, appellee had breached the terms of the contract, and that by reason of said breach, appellant was released from liability. Appellee filed a supplemental petition, admitting that the contract contained certain clauses pleaded by appellant, that it offered to comply with others pleaded, and denied that it willfully or knowingly made any false representations; denied that the provisions pleaded as warranties were in fact warranties. The issues presented in the pleadings will be stated as fully as it may be necessary to state them, under the assignments to which they apply. The case was tried before the court without a jury. The court filed its findings of fact and conclusions of law, and rendered its judgment for plaintiff (appellee) for $1,000. The appellant filed a motion for new trial, and, it being overruled, gave notice of and perfected an appeal to this court.

Preliminary to a discussion of any of the assignments of error, in view of some of the assignments, it might be well to determine whether the contract on which this suit is brought is a form or policy of insurance, and in any way covered or affected by the statutes of this state on the subject of insurance. The contract in this case was executed on the

11th day of February, A. D. 1911, and extended until noon on the 11th day of February, 1912, and by subsequent contract of January 13, 1912, extended until noon on the 11th day of February, 1913. The trial judge applied to the contract the provisions of the Revised Civil Statutes of this state of 1911, embraced in articles 4947, 4948, 4951, 4955, and 4741 (4). Appellant assumes, in many of its assignments and propositions discussed, and very earnestly contends in others that none of these articles of the statute should have been applied by the trial court. That the importance of the above article of the statute as applied to the issues both of fact and law in this case in connection with article 4955 may be readily seen, it will be necessary to quote them here:

"Art. 4955. All the provisions of the laws of this state applicable to the life, fire, marine, inland, lightning, or tornado insurance companies, shall, so far as the same are applicable, govern and apply to all companies transacting any other kind of insurance business in this state, so far as they are not in conflict with provisions of law made specially applicable thereto."

"Art. 4741. No policy of life insurance shall be issued or delivered in this state, or be issued by a life insurance company organized under the laws of this state, unless the same shall contain provisions substantially as follows [subdivision 4]. A provision that all statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties."

"Art. 4947. Any provision in any contract or policy of insurance issued or contracted for in this state, which provides that the answers or statements made in the application for such contract, or in the contract of insurance, if untrue or false, shall render the contract or policy void or voidable, shall be of no effect, and shall not constitute any defense to any suit brought upon such contract, unless it be shown upon the trial thereof that the matter or thing misrepresented was material to the risk or actually contributed to the contingency or event on which said policy became due and payable, and whether it was material and so contributed in any case shall be a question of fact to be determined by the court or jury trying such case."

"Art. 4948. In all suits brought upon insurance contracts or policies hereafter issued or contracted for in this state, no defense based upon misrepresentations made in the applications for, or in obtaining or securing the said contract, shall be valid, unless the defendant shall show on the trial that, within a reasonable time after discovering the falsity of the misrepresentations so made, it gave notice to the assured, if living, or, if dead, to the owners or beneficiaries of said contract, that it refused to be bound by the contract or policy; provided, that ninety days shall be a reasonable time; provided, also, that this article shall not be construed as to render available as a defense any immaterial misrepresentation, nor to in any wise modify or affect article 3096aa (4947)."

"Art. 4951. Every contract or policy of insurance issued or contracted for in this state shall be accompanied by a written, photographic or printed copy of the application for such insurance policy or contract, as well as a copy of all questions asked and answers given thereto. The provisions of the foregoing articles shall not apply to policies of life insurance in which there is a clause making such policy indisputable after two years or less, provided premiums are duly paid; provided, further, that no defense based upon misrepresentations made in the application for, or in obtaining or securing,

any contract of insurance upon the life of any person being or residing in this state shall be valid or enforceable in any suit brought upon such contract two years or more after the date of its issuance, when premiums due on such contract for the said term of two years have been paid to, and received by, the company issuing such contract, without notice to the assured by the company so issuing such contract of its intention to rescind the same on account of misrepresentations so made, unless it shall be shown on the trial that such misrepresentation was material to the risk and intentionally made."

The application of the above-quoted articles of the Revised Statutes of 1911, to the contract sued on, depends upon the question: Is the contract sued on (a fidelity or guaranty bond) to be construed as one of insurance; and appellant also insists that the application of the above articles depends upon the constitutionality, or at least, upon the application to this case of article 4955; second, is article 4955, above quoted, void as being unconstitutional, or inapplicable to this kind of insurance, as claimed by appellant?

[1] The obligation sued on is one of that class of contracts that have come before the courts in recent years having for its object the indemnity of the employer against loss due to dishonesty of the employé. They are compensated sureties, the contract entered into for a premium paid after the fullest investigation, based upon written representations relative to the extent of the risk, and by a company incorporated for the express purpose of furnishing guaranty bonds as a means of revenue to the corporation and its stockholders. There are in principle no facts which differentiate such contracts from guaranty insurance, and the same rules of construction must apply thereto as apply to other insurance contracts. People v. Rose, 174 Ill. 310, 51 N. E. 246, 44 L. R. A. 124; Briefs on Law of Insurance, Cooley, vol. 1, p. 8 (f); Remington v. Fidelity, etc., Co., 27 Wash. 429, 67 Pac. 989; Cowles v. United States, etc., Co., 32 Wash. 120, 72 Pac. 1032, 98 Am. St. Rep. 838; Frost in Law of Guaranty Insurance, § 2; 19 Cyc. 516; Title Guaranty & Surety Co. v. Bank of Fulton, 89 Ark. 471, 117 S. W. 537, 33 L. R. A. (N. S.) 676.

[2] Article 4955, Revised Statutes 1911, was formerly section 55 of chapter 108, General Laws of Texas 1909, p. 192. The subject-matter of chapter 108, as expressed in its title was:

"An act to authorize the incorporation of life, accident and health insurance companies and defining same; and to authorize such companies to transact business in the state of Texas; to authorize other like companies incorporated under the laws of other states, territories and countries to transact business in this state; to regulate the business of such companies; to define the duties and powers of the commissioner of insurance and banking and give to him authority to issue, suspend and revoke permits to such companies to transact business in this state and to apply for the appointment of a receiver for such companies when they become impaired; defining the method of arriving at the value of personal property of such companies for purpose of state, county and municipal taxa-

tion, and exempting such companies from an occupation or gross receipts tax; to fix the situs of personal property of such companies for purpose of taxation; to permit the deposit of securities in the office of the state treasurer; fixing venue of suits and providing the method and manner of service of process; providing penalties for violation of the provisions of this act; repealing all laws in conflict herewith; and declaring an emergency."

Article 3, § 35, of the Constitution of this state provides:

"No bill (except general appropriation bills, which may embrace the various subjects and accounts, for and on account of which moneys are appropriated) shall contain more than one subject, which shall be expressed in its title. But if any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed."

Is the subject-matter of section 55 (now article 4955, Revised Statutes 1911) quoted above, germane to and expressed in the title of the bill? If not, under the provision of article 3, § 35, not coming under the exception, it would be inoperative, except as to life, accident, and health insurance companies, prior to its incorporation as one of the articles of the Revised Civil Statutes of 1911, which we will consider later. The provision of the Constitution is mandatory. Cannon v. Hemphill, 7 Tex. 208; Giddings v. San Antonio, 47 Tex. 548, 26 Am. Rep. 321. The word "subject," as used in the Constitution, means that which is to be dominated or controlled by the particular law. Day Land & Cattle Co. v. State, 68 Tex. 527, 4 S. W. 865. It was intended to reasonably apprise the legislator of the contents of the bill, to the end that surprise and fraud in legislation may be prevented. Doeppenschmidt v. Railway Co., 100 Tex. 536, 101 S. W. 1081. A casual reading of the title of chapter 108, quoted above, will readily disclose that there is nothing in the title to indicate that the Legislature intended in that bill to make all the provisions of the laws of this state applicable to life, fire, marine, inland, lightning, and tornado insurance companies to govern and apply to all companies transacting any other kind of insurance business in this state. It might be that if the section of the bill quoted had confined its application to life, accident, and health insurance companies, and other like companies, the subject of which incorporations and the regulation of their business in this state was indicated in the title, the subject-matter of section 55 would be indicated by the title. But that is not the question now before us. Does the title indicate its intended application to any other insurance company not made the subject of the legislation in the bill? We think not.

[3] Was the incorporation of section 55, c. 108, 31st Leg. 1909, into the Revised Civil Statutes of 1911 as article 4955, an enactment or a re-enactment of the section, so as to relieve it of its former invalidity and make it effective legislation and enlarge its application? It will be noted that said chap-

ter 108 was not an amendment of any former legislation; nor was section 55 of that chapter an amendment of any legislation theretofore enacted, but the entire chapter was initiatory of everything contained therein. The Revised Civil Statutes of 1911 was a compilation of laws previously existing and declared by the Legislature in section 16 of the final title, to be construed as a continuation thereof, and not as new enactments of the laws then in force, and enacted under the sanction of article 3, § 43, of the Constitution of this state, providing that:

"The first session of the Legislature under this Constitution shall provide for revising, digesting, and publishing the laws, civil and criminal; and a like revision; digest and publication may be made every ten years thereafter; provided, that in the adoption of and giving effect to any such digest or revision, the Legislature shall not be limited by sections 35 and 36 of this article."

Section 35 is quoted above and section 36 provides that no law shall be revised or amended by reference to its title, but shall be re-enacted and published at length. Relieved of the limitations in the Constitution that apply to ordinary bills, the Legislature passed—

"A Bill to be entitled 'An act to adopt and establish the Revised Civil Statutes of the state of Texas, and declaring an emergency.'"

The first section of the bill recites:

"Be it enacted by the Legislature of the state of Texas, that the following titles, chapters, and articles shall hereafter constitute the Revised Civil Statutes of the state of Texas"

—one of which articles was section 4955, unchanged and unaltered as it stood, in the original bill in 1909. The case of Judd v. State, 25 Tex. Civ. App. 418, 62 S. W. 543, in which a writ of error was denied by the Supreme Court, the Fifth Court of Civil Appeals had under discussion section 19 of the "final title" of the previous Revised Statutes. Section 19 of that bill is the same as section 16 of the bill adopting the Revised Civil Statutes of 1911.

"Section 16. That the provisions of the Revised Statutes, so far as they are substantially the same as the statutes of this state in force at the time when the Revised Statutes shall go into effect, or of the common law in force in this state at said time, shall be construed as continuations thereof, and not as new enactments of the same."

The court said:

"This section declares that the Revised Statutes are not a re-enactment of the laws, but merely a continuation thereof"

—and held that the fact that an act, invalid because in violation of Const. art. 3, § 35, prohibiting two subjects to be included in the same bill, was included in the Revised Statutes as a separate article did not constitute a re-enactment of the article.

In Fischer et ux. v. Simon, 95 Tex. 234, 66 S. W. 447, on a certified question from the Court of Civil Appeals for the First Supreme Judicial District, the Supreme Court had under consideration the proper construction of article 2369 of the Revised Statutes of 1895.

The solution of the question in a measure depended upon the question whether it was the intention of the Legislature which enacted the Revised Statutes to make them a mere compilation of the laws then existing, or to incorporate in the revision, by changes and amendments, new legislation. The court said:

"This is not an open question in this court. The point came before us for consideration in the case of Insurance Co. v. Walker [94 Tex. 473], 61 S. W. 711, and it was there held that the Revised Statutes of 1895 were but the continuation of the former laws."

The court made a quotation from the Insurance Co. v. Walker Case a portion of which follows:

"The commissioners for revision were not authorized to make changes in the substance of the statute laws of the state, but simply to arrange them in convenient form. To make sure that the laws of the state were not materially changed by such revision, the Legislature which adopted the Code as revised enacted a chapter of general provisions to govern the construction and application of the laws embraced in the Revised Statutes, of which general provision section 19 is in these words [then quotes the section, which is the same in verbiage as section 16 of the final title of the bill, adopting the Revised Statutes of 1911, and above quoted].

In the case of Corbett et al. v. Sweeney, 151 S. W. 858, it was insisted by appellant that since the adoption of the Revised Statutes of 1911 a different construction of the particular provision in question in article 3759 of that revision is required, and that Fischer v. Simon (above quoted) is not applicable. Article 3759 in the Revision of 1911 is in the exact language of article 2369 of the Revision of 1895, and of the original act of March 21, 1889. The court held that what was said by the Supreme Court in Fischer v. Simon is applicable to a case arising since the adoption of the Revised Statutes of 1911, that is, that although the article in question had passed through the revisions since its original passage in 1889, although it may be with some change in its phraseology, yet the construction of the original statute should govern and be determined just as if the Revised Statutes had never been adopted by the Legislature.

Under the above authorities, we hold that article 4955 was not enacted or re-enacted by the bill adopting the Revised Civil Statutes of 1911, and that its application was not enlarged so as to apply to all insurance companies doing business in this state. To hold that a law inoperative prior to the revision, but brought forward and given a separate article in the revision, and thereby re-enacted by the bill adopting the revision, would give the bill an effect directly opposed to what the Legislature intended and so declared in section 16 of the final title. Article 4955 being a mere continuation of section 55 in the original act, and not an enactment or re-enactment thereof, it follows from the cases above cited that the constitutional defect, inherent in its inception, if intended to be applied to all insurance companies, still exists, and renders it inapplicable beyond the effect to be given it in the original bill.

Appellant complains in its first assignment of error of the findings and judgment of the court as being against the law, and by propositions thereunder, too lengthy to restate them here, undertakes to show that the bond sued on contained statements made by appellee in answer to questions as to the duties of the applicant, Lempert, which appellant asserts to be conditions precedent and promissory warranties, all of which appellant says were breached and violated by appellee, and that because breached and violated, the trial court should have found that the bond was breached by appellee, and have rendered judgment for appellant. The alleged breach lies in the fact that Lempert was, at all times after the execution of the bond, the cashier of the West Texas Grocery Company, in addition to that of plaintiff; that he was also head bookkeeper and made entries and directed entries to be made, and that notice thereof was not given to appellant and its consent obtained. Appellee was asked:

"4. What is the applicant's position in which bond is now requested? A. Cashier.

"5. State fully the duties which devolve upon applicant. A. Cashier in mercantile business."

"7. Will applicant indorse checks, drafts, money orders or other bankable papers? A. No."

"Will applicant handle any cash? If so, state the largest sum applicant is likely to handle at any one time. A. $1,000.00."

Answering other questions, plaintiff said he had so systematized his business that books, accounts, and vouchers kept by employés would serve as a check upon Lempert and enable plaintiff to detect and discover any act of fraud. There are other questions and answers, but the above will be sufficient to indicate the matters decided. Appellee made the foregoing and other answers not copied, and then stated before signing:

"The foregoing answers are to be taken as conditions precedent to and the basis of said bond applied for, or any other bond that may be executed by the National Surety Company for the undersigned upon applicant above named in said position or any renewal or continuation of such suretyship, and the undersigned is aware of no reason why the National Surety Company cannot safely assume the risk on account of said applicant."

The bond on appellee's statement provided as follows:

"7. All written statements and declarations concerning the employé, or his duties or accounts, made to the company by the employer, or any officer of the employer, at any time, are hereby made the basis of this bond, or any renewal or continuation thereof as to the employé and they each and all are warranted by the employer to be true. If any of such statements or declarations be false or untrue in any particular, or if any willful suppression or misstatement be made in any claim for or proof of any loss under this bond, or if any fact affecting the risk of the company at any time, then this application shall be void, and the company shall in no case be liable hereunder."

"8. This bond is entered into on the condition that the business of the employer shall be con-

tinued to be conducted and the duties of the employé shall remain in accordance with the written statements made by the employer to the company relative thereto; and if during the continuance of this bond or any continuation or renewal hereof, any circumstance occur or change be made which shall have the effect of making the actual facts different from such statements or any of them without immediate written notice thereof being given to the company at its principal offices in the city of New York, and a written consent and approval of the company being obtained, then the company shall not be liable hereunder for any act of the employé thereafter committed."

The trial court made the following findings (which we adopt and make our own, some of which we very extensively abbreviate and others, on more important features, we copy in full, indicated by quotation marks):

That defendant executed the bond sued on in the sum of $1,000, guaranteeing the plaintiff against loss by dishonesty of Lempert, amounting to embezzlement or larceny for one year from February 11, 1911, and thereafter extended the liability until the 11th of February, 1913; that in connection with the execution of the bond, plaintiff's manager, Murphy, made certain representations to defendant in writing in reply to questions, which representations appear on the employer's statement; that said bond was also based on the written application of Lempert; that at various times and under various circumstances and from different persons (the court in his findings giving dates, circumstances, persons from whom received, and amounts) Lempert received amounts of money and checks within the time covered by the terms of the bond, amounts aggregating $1,542.96; that Lempert appropriated the said funds of plaintiff to his own use; that at various times of said appropriations Lempert was in the employ of plaintiff as cashier; · that the several appropriations occurred in Presidio county, Tex., and under circumstances amounting to embezzlement or larceny.

"(16) During the period of time beginning February 11, 1911, and for some time prior thereto, and until about December 5, 1912, W. G. Lempert was employed by plaintiff and held the title of cashier. The duties which he actually performed during the whole of said period of time included the receiving and custody of and accounting for all cash and cash items of any and all descriptions which were received by plaintiff in the course of its business from any and all sources; also the paying out for and on behalf of plaintiff; said Lempert also had and exercised supervision over the two bookkeepers employed by plaintiff, and Lempert kept the plaintiff's cashbook and also made occasional entries in the journal and in the plaintiff's ledger. The plaintiff was during all of said time an incorporated company, doing a general mercantile business in the town of Marfa. The West Texas Grocery Company, also an incorporated company, had its books of account and transacted its office business in the office of the plaintiff. Leimpert was also cashier for said West Texas Grocery Company, and performed like duties for said company as those performed by him for plaintiff. No notice prior to December 10, 1912, was given to defendant, at its home office, of Lempert being engaged in the performance of any duties other than those of cashier for plaintiff, except that

Charles Kraemer, the soliciting agent for defendant at Marfa, knew the exact nature of the duties of Lempert at the time he solicited and procured the issuance of the bond herein sued upon.

"(17) With reference to the indorsing of checks received by plaintiff in the course of its business, the rule of plaintiff and the practice almost exclusively followed was that the name of Murphy-Walker Company was placed on the back thereof by a rubber stamp with a line underneath, on which W. P. Murphy signed his name and affixed his title as manager and treasurer. On some few occasions, because of Mr. Murphy's absence, Lempert would sign the name of Murphy on this line on the back of the checks, but this was done against the plaintiff's rule, and without the knowledge or consent of its officers or of Mr. Murphy.

"(18) Plaintiff's cashbook shows that during the years 1911 and 1912, the cash receipts represented by actual cash and cash item, the bulk of which were checks, ran from $12,000 to $30,-000 per month, and cash receipts of the West Texas Grocery Company amounted to about the same. The average cash receipts of the two companies combined averaged about $35,000 per month, $17,500 each. Deposits were made daily by Lempert of these receipts in the Marfa State Bank.

"(19) The plaintiff provided for Lempert's use in giving receipts for payments made by customers on account, credit slips in pads. The system under which plaintiff conducted its business provided that Lempert should give the customer one of these credit slips as a receipt for each payment made, and required Lempert to keep a carbon copy of such slip so issued for the files of the company and as a basis for making the proper entry on the cashbook. These carbon copies so retained by Lempert were detached and loose. Had the plaintiff provided a bound book containing such credit slips, with detachable duplicates for the customer, the $150 Frank Spencer defalcation and the $62.10 Fleinman defalcation, and the $17 Campbell Davis defalcation could not have occurred without prompt detection by plaintiff. The loose-slip system facilitated concealing of said defalcations by enabling Lempert to extract the corresponding credit slips from the files without same being missed by any one.

"(20) The only system by communicating with its customers which plaintiff conducted and operated under for the purpose of ascertaining whether Lempert was making proper entry of all payments made on account by customers was to send a statement of account to each customer at the end of the month, showing thereon the items charged against the customer and the credit items allowed him on the books of plaintiff, such statements containing at the bottom in conspicuous type the following: 'This statement is sent you as being correct; if not so, advise us at once.' In addition to this, when the customer had allowed his account to run for 60 or 90 days without any payment being made, Mr. Murphy, the plaintiff's manager, would write such customer, inquiring whether or not the account as rendered the customer was correct, and requesting a payment thereon. These monthly accounts were made out by the bookkeeper and placed upon the desk of Manager Murphy. Murphy inspected the accounts, and caused the same to be made out to the customer."

The court further found that at the time of signing the statement, Lempert was not indebted to plaintiff; he was then indebted in the sum of $73; that plaintiff's custom was to allow its employés 60 days time on accounts; that during 1911 and 1912 Lempert's account with plaintiff amounted to more than his monthly salary; that plaintiff's rule

did not permit Lempert to overdraw his account in cash; that defendant wrote plaintiff immediately after the defalcation was reported to defendant, suggesting that plaintiff cause criminal proceedings to be instituted against Lempert, which plaintiff declined to do; that early in September, 1912, complaint was made to Murphy of two items; that Murphy reported the complaint to Lempert, and instructed him to investigate it; that Murphy knew in 1911 and 1912, and before Lempert was made cashier, that Lempert occasionally took a drink of intoxicating liquors, but never knew of his having drunk to excess.

In the twenty-seventh paragraph the court found:

"Neither the application signed by Lempert nor the employer's statement signed for plaintiff by Murphy, nor the employer's declaration signed for plaintiff by Murphy, were attached to the bond herein sued upon, nor did said papers, or any of them, accompany the said bond, nor was plaintiff furnished with a copy of said papers or any of them at any time as a part of or in connection with the execution of said bond."

In the twenty-eighth paragraph the court found:

"The defendant refused payment on the bond herein sued upon on the 1st day of April, 1913."

In the twenty-ninth paragraph, the court found as follows:

"None of. the representations made by Lempert in his application or by Murphy in the employer's statement and the employer's declaration were made with the intent of misleading the defendant; none of them were fraudulently made; no matter not disclosed by the answers to the questions contained in said papers was withheld with the intent of misleading or deceiving defendant or withheld fraudulently. None of said representations were material except the representation as to the eleventh question, propounded in the employer's statement as shown by finding of fact No. 1 (and this only in event it was plaintiff's duty to furnish the credit slip in book form), and said representation was material, and entered into and affected only three of said appropriations by Lempert, aggregating $229.10, as shown in said finding of fact. None of said representations (except the one referred to last above, set out in finding of fact No. 19) contributed to the event on which the bond became payable."

The trial court stated his conclusions of law in 11 paragraphs, applying the articles of the statutes quoted above, but, for brevity, we copy only one, the eleventh, and do so because it embraces the others and it is partly law and fact. It is in these words:

"It fully appearing from the finding of fact and conclusions of law aforesaid that plaintiff suffered loss to the extent of $1,542.96 through the dishonesty, amounting to embezzlement, of W. G. Lempert, while said Lempert was cashier of plaintiff's mercantile company between February 11, 1912 and December 5, 1912, and that all of said loss was sustained through no fault of plaintiff, and no material variance of any representation made to defendant for the issuance of said bond having been proved, and the defendant having refused payment on said bond on April 1, 1913, it is my conclusion that plaintiff should have judgment against defendant for the sum of $1,000 (being the penalty provided for in said bond), together with interest thereon at the rate of 6 per cent. per annum from April 1, 1913, until paid, and all costs of suit therein."

[4] There are at least two reasons why appellant's first assignment of error cannot be sustained:

First. Having concluded that the guaranty bond sued on is insurance, under article 4948 above quoted, no defense based on any misrepresentation made in the applications for or in obtaining or securing the contract is valid unless the defendant shall show that, within 90 days after discovering the falsity of the misrepresentations made, it gave notice to the plaintiff that it refused to be bound by the contract. Defendant's answer and the facts found by the court show that the defendant had notice of the defalcation of Lempert on the 30th of December, 1912, but the answer does not allege that it did not, at that time, know of the falsity of the misrepresentations, if defendant wished to rely upon such as a defense, nor does the answer show when it discovered the falsity of them, or that it ever gave notice to defendant that it refused to be bound by the contract. National Life Ass'n v. Hagelstine, 156 S. W. 353. In that case, the court said:

"The agreed statement of facts shows that appellant did not give such notice. It follows that it could not make the defenses offered by it, and it is immaterial as to what errors may have been committed in admitting evidence or in the charge of the court. An instruction to return a verdict for appellee would have been justified."

[5] Second. Under article 4947, above quoted, if the answers or statements made in the application for the bond sued on were untrue or false, it would not constitute a breach of the contract on the part of the plaintiff, as claimed in the assignment, and would be no defense to the suit, unless it was alleged in the answer and shown as a fact on the trial that the answers and statements made by the plaintiff, claimed by defendant to be false, were material to the risk, or actually contributed to the contingency or event which made the bond payable. Its materiality and effect was a fact to be determined by the court. The defendant did not make such an issue in its answer, but, even in the absence of such issue made in the pleadings, the trial court found in the twenty-ninth paragraph above quoted that none of the representations were material or contributed to the loss, except the items named, and which items the court excluded in its estimate. Not having made the materiality of the answers and statements an issue to be determined by the court, appellant cannot now be heard to complain of want of evidence to sustain the facts found, or the conclusions of law on such facts. These issues of fact were peculiarly within the province of the court to determine, made so by the statute. However, we have read the evidence of the witnesses and believe the finding of the court sustained by the proof. Under the provisions of the statutes

of this state, a contract of insurance cannot be breached by the insured, upon a fact or facts not found by the court or jury to be material to the risk or actually contributing to the contingency or event which made the bond payable. The assignment is overruled. What we have said above applies to assignments 2, 3, 4, 5, 6, 7, 8, 9, 10, and 11, and they are each overruled.

[6] Appellant's twelfth and thirteenth assignments of error are based upon the trial court's ninth and tenth conclusions of law, the ninth going to the application of article 4955, Revised Civil Statutes, and the tenth to the application of articles 4741, 4947, 4948, 4951, and 4953, Revised Civil Statutes, to the facts of this case, and holding that none of the representations made by appellee were warranties.

We have already discussed the application of article 4955 to the facts of this case. However, should the provision of the laws of this state applicable to insurance companies mentioned in article 4955 be made applicable to the facts of this case by other articles of the statute so far as the provisions of said other articles are invoked; and independently of the provisions in said article 4955, to the effect that the provisions of the laws of said companies should have general application to all other companies transacting any other kind of insurance, it would ·be immaterial that the court in his conclusion stated that said articles would embrace insurance companies "such as the one involved in this suit." There is nothing in article 4955, except its provision to make all the laws, applicable to the companies named, have general application. We have not found and our attention has not been called to a reported case where article 4955 has been invoked, to enable the court to apply the provisions of other articles of the statute.

In the case of Scottish Union & National Insurance Co. v. Wade, 127 S. W. 1186, and in which a writ of error was refused, the court had under discussion the application of articles of the statute now embraced in numbers from 4947 to 4951, both inclusive, and in which it was insisted that the act embracing said articles were intended to apply to life and accident insurance only, and that it should be so held. The court, after stating the history of the legislation and quoting the words of article 4947, said:

"This language is very broad, and indicates that it was the intention of the Legislature that it should cover every kind and class of insurance, and there is nothing in the entire act, except the proviso contained in article 3096 EEE (now 4951), which has already been quoted, and which has no application to fire insurance, tending to limit its scope."

To the same effect is National Life Association v. Hagelstine, 156 S. W. 353.

It is our opinion that the articles of the statute referred to by the court in the conclusions of law in paragraph 10 have application to this case, independently of article 4955, and the court was not in error in applying the provisions of the statute named. The assignments are overruled.

Appellant's fourteenth, fifteenth, sixteenth, seventeenth, eighteenth, nineteenth, twentieth, twenty-first, and twenty-second assignments are disposed of by what has been said in discussing other assignments. If the appellant was in a position to complain, the fourteenth assignment might be sustained, as the item of $140 is shown by the evidence to have been deposited in the bank as a part of the daily deposits to the account of appellee, although no entry was made on the cashbook. But the elimination of the amount would still show a defalcation of more than the amount for which judgment was rendered. The $150 item complained of in the fifteenth assignment was not estimated by the court.

We find no error, and the judgment is affirmed.