WESTERN INDEMNITY CO. v. FREE AND ACCEPTED MASONS OF TEXAS.

(No. 8513.)

(Court of Civil Appeals of Texas. Ft. Worth. Oct. 27, 1917. Rehearing Denied Dec. 1, 1917.)

1. INSURANCE ⬤═539(3) — INDEMNITY INSURANCE—"CLAIM FOR DAMAGES."

An action by the obligee, on a bond indemnifying it against default of its treasurer, for the amount of a defalcation, is a claim for damages within Vernon's Sayles' Ann. Civ. St. 1914, art. 5714, providing that no stipulation in any contract requiring notice to be given of any claim for damages as a condition precedent to a right to sue thereon shall ever be valid, unless such stipulation is reasonable; and any such stipulation fixing the time within which such notice shall be given at a less period than 90 days shall be void, so that a condition of the policy requiring immediate notice was void.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Claim for Damages.]

2. INSURANCE ⬤═2 — FIDELITY INSURANCE — "INSURANCE COMPANY."

A fidelity company guaranteeing the honesty of persons holding places of trust and the performance of contracts and undertakings is an insurance company, and the same rules of construction must apply thereto as apply to other insurance contracts.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Insurance Company.]

3. INSURANCE ⬤═645(3) — FIDELITY INSURANCE—NOTICE OF LOSS—REASONABLE TIME.

Where the fidelity insurance company did not plead any damage by delay in giving notice, or that the principal had disposed of his property during the time between the giving of notice and the time when it should have been given, whether the notice actually given was within a reasonable time was immaterial.

4. INSURANCE ⬤═665(3)—FIDELITY POLICIES— REPRESENTATIONS IN APPLICATION—KNOWLEDGE OF DEFAULT—EVIDENCE.

Evidence held to warrant finding of jury that the Grand Master of the lodge, indemnified in a fidelity policy against defalcation by its treasurer, had no knowledge of previous defaults or irregularities in auditing the books.

---

⬤═For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

5. BENEFICIAL ASSOCIATIONS ☞14 — STATEMENTS OF AGENT—BINDING EFFECT—SCOPE OF AUTHORITY.

The Grand Master of a lodge, whose duties were to preside at all communications of the Grand Lodge, to present at each communication a written message, to constitute chartered lodges and to visit lodges, in the absence of pleading or evidence to show the authority upon his part, could not bind the lodge by his statements in an application for fidelity insurance for the treasurer.

6. INSURANCE ☞390—FIDELITY INSURANCE—BREACH OF CONDITIONS—"WAIVER."

Where the insurer in negotiations or transactions with the insured recognizes the continuing validity of the policy, after knowledge on its part of the conditions upon which the claim of forfeiture is based, or if it does acts based on the validity of such policy, or requires the insured by virtue thereof to do some act or incur some trouble or expense, the forfeiture is, as a matter of law, waived.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Waiver.]

7. INSURANCE ☞558(3) — FIDELITY INSURANCE—BREACH OF CONDITIONS—"WAIVER."

Where insurer 4 months after notice of defalcation wrote to an officer of the obligee, stating that the answers in the application were untrue, that notice had not been given in time, and requested a statement showing receipts and disbursements to make which the obligee was required to incur expense, the condition of the bond making it void if notice were not given within a stipulated period, and which had not been complied with, was waived.

8. INSURANCE ☞396(1) — FIDELITY INSURANCE—BREACH OF CONDITIONS—"WAIVER."

In view of Vernon's Sayles' Ann. Civ. St. 1914, art. 4948, providing that in all suits brought upon insurance contracts or policies hereafter issued or contracted for in this state, no defense based upon his misrepresentations made in the application for, or in obtaining or securing the said contract, shall be valid, unless the defendant shall show on the trial that, within a reasonable time after discovering the falsity of the misrepresentations so made, it gave notice to the assured; that it refused to be bound by the contract or policy, provided that 90 days shall be a reasonable time, where an obligee on a treasurer's bond at the request of the surety made up a report which was required more than 4 months after notice of the default and notice of the falsity of the statements in the application, the defense of falsity of such statements was waived.

9. INSURANCE ☞430—FIDELITY BOND—LIABILITY.

If the treasurer against whose defalcation a surety bond was taken had made a defalcation before the bond was taken and borrowed money to cover the shortage, and after the execution of the bond repaid the money borrowed with the funds of the lodge, there was a new defalcation, for which the surety was liable.

10. INSURANCE ☞602—FIDELITY BOND—LIABILITY.

Vernon's Sayles' Ann. Civ. St. 1914, art. 4746, provides that in all cases where a loss occurs and the life insurance company, or accident insurance company, or life and accident, health and accident, or life, health, and accident insurance company liable therefor shall fail to pay the same within 30 days after demand therefor, such company shall be liable to pay the holder of such policy, in addition to the amount of the loss, 12 per cent. damages on the amount of such loss, together with reasonable attorney fees for the prosecution and collection of such loss. Article 4955 provides that all the provisions of the laws applicable to the life, fire, marine, inland, lightning, or tornado insurance companies shall, so far as the same are applicable, govern and apply to all companies transacting any other kind of insurance business in this state, so far as they are not in conflict with provisions of law made specially applicable thereto. Const. art. 3, § 35, provides that no bill (except general appropriation bills, which may embrace the various subjects and accounts, for and on account of which moneys are appropriated) shall contain more than one subject, which shall be expressed in its title; but if any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed. Held, that article 4955, being originally Acts 31st Leg. c. 108, § 55, and being void because its purpose was not expressed in the title, and having gained nothing by re-enactment into article 4955, is void as in conflict with Const. art. 3, § 35, so that a judgment awarding 12 per cent. penalty for failure to pay the loss on an indemnity bond was improper.

Appeal from District Court, Tarrant County; Bruce Young, Judge.

Action by the Free and Accepted Masons of Texas (colored) against B. R. Bluitt and others. Judgment for plaintiff, and defendant Western Indemnity Company appealed. Reformed and affirmed.

Carden, Starling, Carden, Hemphill & Wallace, all of Dallas, for appellant. Mike E. Smith, O. W. Gillespie, and G. W. Dunaway, all of Ft. Worth, for appellee.

BUCK, J. The Free and Accepted Masons of Texas (colored) instituted this suit against B. R. Bluitt, as principal, and the Western Indemnity Company, as surety, to recover the sum of $13,918.09, together with attorney's fees and penalties, on two certain fidelity bonds executed by Bluitt, as principal, and the Western Casualty & Guaranty Insurance Company, as surety. The last-named company, subsequent to the execution of the bond, sold and transferred to the appellant company all its rights, interest, and property, and the appellant company assumed its obligations. Hence the appellant company was regarded in the trial court as having executed the original bond, and will be so treated here. Bluitt answered by general demurrer and general denial, and the indemnity company answered by general demurrer, general denial, and various special exceptions, which will be noted in the course of this opinion.

Plaintiff alleged that Bluitt was the duly elected Grand Treasurer of the order in Texas, and that it was his duty to receive and safely keep in his possession certain sums of money belonging to plaintiff, consisting of dues, beneficiary, and per capita tax assessments, and sick benefit and entertainment funds collected by the plaintiff from its members, and to account to plaintiff for same. It alleged that on or about the 26th day of May, 1911, said Bluitt, as principal, and the Western Casualty & Guaranty Insurance Company, as surety, for a valuable consideration, executed and delivered to plaintiff two

certain bonds in writing, one in the sum of $15,000, dated May 26, 1911, and the other in the sum of $10,000, dated May 31, 1911, and that said bonds by their terms were to cover a period of one year, ending on the 26th and 31st days of May, 1912, respectively. It was claimed by the plaintiff that the bonds were, and were intended to be, cumulative, and constituted an indemnity bond in favor of the plaintiff in the sum of $25,000; but the defendant below pleaded that the bond in the larger amount was intended, and was in fact, succeeded by the $10,000 bond, and the judgment hereinafter mentioned so finds.

Plaintiff alleged that on the 26th day of October, 1911, the said Bluitt, as plaintiff's Grand Treasurer, had on hand and in his possession as funds of plaintiff derived from the sources above mentioned the sum of $151.-41, and that subsequent thereto, and up to and including July 12, 1912, plaintiff received from said sources the sum of $37,671.30, making a total of $37,821.71; that he paid out and accounted to plaintiff after October 26, 1911, various mentioned sums of money, aggregating $23,904.62; that said Bluitt fraudulently embezzled and misapplied and appropriated to his own use and benefit, during the period from October 26, 1911, to October 5, 1912, $13,918.09, and thereby defendant Bluitt became indebted to and bound to pay to plaintiff the said sum. It further pleaded that due notice of said shortage and embezzlement on the part of Bluitt had been given to the Western Indemnity Company by plaintiff, and that on April 26, 1913, it made a demand in writing upon said company for said amount. Copies of the two bonds sued upon were attached to plaintiff's petition as exhibits.

The defendant company specially pleaded that to induce the Western Casualty & Guaranty Insurance Company to execute said bond, and to become the surety of said Bluitt, plaintiff, acting through and by its Grand Master, John W. McKinney, made application in writing to the said bonding company, and in said application made statements, answers, and representations which were stated in said application to be true and correct, but that said answers, representations, and statements were in many alleged respects untrue and false, and that said statements and representations were material and induced defendant's predecessor in the bond to execute the same, and that it would not have executed said bond had it not relied upon the truth of said statements, answers, and representations. Wherefore defendant pleaded that it should be discharged. Defendant further pleaded that the plaintiff had failed to give the defendant immediate notice, as provided in the bond, of Bluitt's shortage and embezzlement, and that in fact more than 60 days elapsed after the fact of said shortage and embezzlement had become known to the Grand Master and other officers of the plain-

tiff before any notice thereof was given to the defendant, and on this ground it claimed to be discharged from the obligations of the bond.

The record in this case is very voluminous; the transcript consisting of 177 pages, the statement of facts of some 358 pages, the brief of appellant presents some 198 pages, while that of appellee contains 131 pages. Hence the consideration of the case has required considerable time and · labor on our part, and it would be impracticable within the proper limits of an opinion to discuss separately each of the numerous propositions contained under the several assignments, or to discuss and seek to distinguish the various authorities cited, respectively, by appellant and appellee on the several issues presented. Wherefore we will content ourselves with a discussion· of the controlling questions raised by appellant, submitting, in part, the authorities which, in our opinion, support the conclusions we reach.

Appellant's first assignment complains of the refusal of the court to give a peremptory instruction, basing its claim upon the contention that the bond in this case provided as a condition precedent that upon the discovery of any officer of the obligee of loss thereunder, "written notice of such loss shall be immediately given by the obligee to the company, * * * and failure to give such immediate notice * * * within such time shall relieve the company from all liability hereunder"; that the evidence without dispute disclosed that on September 30, 1912, Bluitt, who resided in Dallas, wrote to Grand Master McKinney, who resided in El Paso, a letter in which he disclosed the fact that he was unable· to pay many of the warrants issued by the Grand Lodge, although he was supposed to have funds sufficient therefor in his possession as Grand Treasurer, and that he had negotiated loans on all his property to the full extent it would stand, and that he had no source from which he could get the money with which to pay these claims, except the sale of his property and his professional income as a physician; that, on October 5th thereafter, there was a meeting in Ft. Worth of various Grand Lodge officers, including the Grand Master, the Grand Secretary, and the Grand Treasurer, and that at said meeting Bluitt disclosed to those present his inability to pay these amounts mentioned, and that an audit of his books revealed that he was short in his accounts in the sum of $13,397.26; that in spite of the terms of the bond heretofore mentioned requiring immediate notice to defendant company of any shortage or embezzlement or defalcation on the part of Bluitt, plaintiff did not notify the defendant of the condition theretofore known to its officers until December 2, 1912, more than 60 days after Bluitt had written, and McKinney had received, the letter before

mentioned. The evidence discloses that said letter was written by Bluitt on the date mentioned, and that the meeting of the Grand Lodge officers was held as claimed, and that the audit of the books disclosed the shortage in the amount alleged upon the date mentioned, and that no notice was given of such condition until December 2, 1912. The evidence further shows that at this meeting at Ft. Worth, Bluitt offered to turn over to the Grand Lodge his property, which he claimed to be reasonably worth $40,000 or $50,000; that an investigation was made by the Grand Master and other officers of the condition of said property, in order to determine whether or not the amount of shortage revealed could be made out of the sale of said property; that a deed of trust was executed by Bluitt in favor of William H. McDonald, Grand Secretary, on certain described property located in Dallas and belonging to Bluitt; that this instrument was rejected by the Grand Master, and that he stipulated that a straight deed should be made to such property to the Grand Lodge, in accordance with the offer he claimed Bluitt made at the Ft. Worth meeting; that an attorney was employed by McKinney to investigate the titles and condition of the property offered, and it was found, as testified to by McKinney and other Grand Lodge officers, that said property, each and all of it, was covered by mortgages or vendor's liens, which rendered the prospect of realizing out of the sale of such property sufficient funds to pay off the indebtedness extremely improbable; that thereupon McKinney refused to accept said property in satisfaction of said alleged shortage, and notified in writing the defendant company that Bluitt was in arrears in a sum not yet definitely determined, but supposed to be about $13,700, and that claim was made on the defendant company therefor; that Bluitt had been suspended from his office and was not authorized to further act as Grand Treasurer. In said letter a request was made for blanks for making proof of loss.

In order to determine the tenability of the contention made under this assignment and proposition, it will be necessary for us to decide whether article 5714, V. S. Texas Civil Statutes, applies, which article reads, in part, as follows:

"No stipulation in any contract requiring notice to be given of any claim for damages as a condition precedent to the right to sue thereon, shall ever be valid, unless such stipulation is reasonable; and any such stipulation fixing the time within which such notice shall be given at a less period than 90 days shall be void."

[1] Is this suit a "claim for damages" within the meaning of the article quoted? We are of the opinion that it is. In the case of Maryland Casualty Company v. Hudgins, 72 S. W. 1047, the Court of Civil Appeals for the Fifth District held, in an opinion by Chief Justice Rainey, that a similar provision in an accident insurance policy was void, because in conflict with this article, then article 3379, Revised Civil Statutes. In the course of the opinion this language was used:

"It is further urged that this is not such a claim for damages as is contemplated by the statute, and, therefore, it does not apply. 'Damages are based on the idea of a loss to be compensated, a damage to be made good.' In general, damages is 'that which is given or adjudged to repair a loss.' Mrs. Hudgins sustained loss by the death of her husband. The effect of defendant's contract is to respond in damages in certain contingencies, one of which has transpired. This, we think, brings her claim within the purview of the statute."

See, also, Ætna Life Insurance Co. v. Griffin, 58 Tex. Civ. App. 198, 123 S. W. 432, writ denied.

In the case of Royal Casualty Co. v. Nelson, 153 S. W. 674, the Court of Civil Appeals for the Fourth District held a provision in a contract of insurance in a casualty policy, providing that notice of injury should be given within ten days, was void, as contrary to this statute. Damages is "the value in money of what is lost or withheld; the estimated money equivalent for detriment or injury sustained; that which is given or adjudged to repair a loss." Railway Co. v. Falconer (Ky.) 97 S. W. 729 (quoting Cent. Dict.). "Damages, in general legal acceptation, means compensation for the loss incurred, or the injury sustained, in the given case." Myhra v. Railway Co., 62 Wash. 1, 112 Pac. 939; North Coast R. Co. v. Kraft Co., 63 Wash. 250, 115 Pac. 97, 102.

[2] A fidelity company guaranteeing the honesty of persons holding places of trust and the performance of contracts and undertakings is an insurance company. And the same rules of construction must apply thereto as apply to other insurance contracts. National Surety Co. v. Murphy-Walker Co., 174 S. W. 997. See article 4733, Vernon's Sayles' Texas Civil Statutes. Article 4955 of the statutes provides:

"All the provisions of the laws of this state applicable to the life, fire, marine, inland, lightning, or tornado insurance companies, shall, so far as the same are applicable, govern and apply to all companies transacting any other kind of insurance business in this state so far as they are not in conflict with provisions of law made specially applicable thereto."

But for reasons hereinafter given, we do not think this article can be given any controlling effect here. We conclude that the stipulation in the bond requiring immediate notice of loss is void, being in contravention of the terms of article 5714, supra.

[3] We are not called upon to decide the question, irrespective of the provisions in the bond as to immediate notice, and irrespective of the statutory provision in article 5714, supra, to the effect that any stipulation fixing the time within which notice shall be given at a less period than 90 days shall be void, whether the notice was in fact given within a reasonable time, for plaintiff did not plead any facts to show that it had been

Injured by the delay in giving notice alleged, nor that its condition had been altered, or that it had thereby been deprived of the opportunity to recoup itself out of any funds belonging to the principal in the bond; nor are we cited to any evidence tending to show that Bluitt had disposed of his property in the interval between the discovery of the shortage by the Grand Lodge officers and the giving of the notice to defendant company, nor is there any evidence that he had absconded or otherwise secreted himself, or any of his property, from the processes of the law. The evidence is to the contrary, and the record discloses that he testified as a witness on the trial of this case.

Another contention under this assignment, as contained in the second proposition thereunder, is that appellee's Grand Master, acting for plaintiff, for the purpose of inducing the appellant company to execute the bond sued on, made and warranted certain material, false, and untrue statements to the surety company in the application for the bond, to wit, that all the books of accounts and moneys and properties handled by the applicant, or his predecessor in office, had been examined and verified up to July 24, 1910, and that appellant relied on such statements.

For the purpose of the discussion of the question here presented and others under subsequent propositions, it may be well to set out certain questions and the answers thereto contained in the application for the bond. The evidence shows that Bluitt had been Grand Treasurer of plaintiff body since 1898, and that during the early years of his tenure of office he had given only a personal bond which was, as he expressed it, merely a "straw bond"; that some question had been raised in the Grand Lodge as to the sufficiency of this character of a bond, and that in 1909 a surety bond was executed, running from October of that year to October, 1910; that this company declined to reissue a bond at the expiration of that year, and that Bluitt himself applied to one Ellis of the Phillips Insurance Company of Dallas, which company had been writing fire insurance policies for Bluitt, and that Ellis brought to Bluitt the application blank which Bluitt filled out and sent to McKinney, the Grand Master, for approval. These questions and the answers thereto, upon which defendant relies to defeat its indemnity obligation, are as follows:

"(1) Q. Is the applicant now, or has he to your knowledge or belief been, from any cause short, in arrears, or in default in this or any other service, office, or position? A. No.

"(2) Q. Is there to your knowledge any account now due from the plaintiff to your body, or to a supreme or governing body? A. No.

"(3) Q. Have all the books of accounts kept and moneys and properties handled by the applicant or his predecessor in this office been examined and verified? A. Yes.

"(4) Q. If so, up to what date? A. Up to July 24, 1910.

"(5) Q. From whom or from what source will he receive moneys? A. From the Grand Lodge through the Grand Secretary.

"(6) Q. What will probably be the largest amount he will receive at any one time? A. Ten thousand dollars.

"(7) Q. To whom will he remit, or how will he dispose of money coming into his hands? A. All funds are payable on order of the Grand Master and Grand Secretary.

"(8) Q. How often will he be required to remit or pay over money received? A. Will pay out funds on orders as above.

"(9) Q. What amount, if any, will he be permitted to retain after so remitting or paying over? A. Will be kept on deposit in bank.

"(10) Q. Will he be required to deposit moneys received to a bank account kept for that purpose? A. Yes.

"(11) Q. If so, in what name will such account be kept? A. B. R. Bluitt, Grand Treasurer.

"(12) Q. Name of bank designated for that purpose. A. Guaranty State Bank & Trust Company.

"(13) Q. What official signature will be required on the bank checks to draw money from said bank accounts? A. B. R. Bluitt, Grand Treasurer. Such checks to be issued on orders signed by Grand Master and Grand Treasurer.

"(14) Q. What officer will countersign checks? A. None, but checks are issued only on orders signed by Grand Master and Grand Secretary.

"(15) Q. How often will his books and accounts be examined and verified with funds and property on hand in bank? A. Third Tuesday in July each year.

"(16) Q. By whom will this be done? A. By auditing committee."

Appellant pleaded and here urges the facts to be that these answers were false and misleading in many respects, and that the evidence discloses that the Grand Master of the appellee at the time he made these answers knew that Bluitt had been short in his accounts back as far as July, 1904, when the Grand Lodge met at Houston, and by reason of his defalcation was unable to meet at that time certain orders and demands for payment presented to him, and that in order to avoid arrest, he fled from the state; that said Bluitt at the time of making said answers was using for his private purposes and for private investments and speculations the money belonging to plaintiff, which fact McKinney knew at the time of making said answers; that the books of Bluitt as Grand Treasurer had not been verified or the moneys and property examined and counted to see whether in fact he had on hand as Grand Treasurer the moneys which he had received as said officer, less the amounts paid out on proper orders and warrants. It is further claimed that the facts show that at no time during the period of Bluitt's incumbency did he keep an account in the name of the Grand Treasurer, but that he placed all funds received from the Grand Lodge with his private funds and checked on such funds indiscriminately for Grand Lodge purposes and private purposes; that his checks in payment of Grand Lodge warrants were not signed officially, but simply in his personal capacity; that the facts were that he did not keep his account in the Guaranty State Bank & Trust Company alone, and

that said bank had not been designated by plaintiff as a depository, and that said Bluitt was not required to keep the Grand Lodge funds in said bank, but that in fact he kept his accounts in two named negro banks as well as in other banks.

J. W. McKinney, Grand Master, testified that at the time he signed the application for the bond the answers to the questions had already been filled out by Bluitt, and that he believed the statements made and the answers to said questions were in fact true; that he never knew of any shortage or default of Bluitt prior to receipt of the letter of September 30, 1912, before mentioned, and that he believed Bluitt kept his Grand Lodge account in a separate bank and signed all checks on said fund as Grand Treasurer; that he had never had occasion to receive a check from said Bluitt as Grand Treasurer, but that he retained out of such funds as he remitted to Bluitt his own fees and compensation; that at each Grand Lodge, which met annually in July, he as Grand Master appointed an auditing committee to examine the accounts, books, and moneys, in the hands of the Grand Secretary and Grand Treasurer, and that such committee had reported, not only on July 24, 1910, but at the previous session of the Grand Lodge, that the books and accounts of said officers had been examined and verified and found correct; that when he signed said application he believed that each and every answer made therein, though in fact such answers had been written out by Bluitt before sending to the witness the application, was correct, and that the information given in said answers constituted the real facts. In this connection it may be stated that the testimony of Bluitt himself discloses a system of handling trust funds very unbusinesslike, and that in fact he did not keep any account in the name of the Grand Treasurer, but that he kept all funds both personal and Grand Lodge funds, in various banks including the two negro banks, in his own name, and that he drew on said funds for private purposes as well as for Grand Lodge purposes; that when he wished to buy a piece of property he used any funds on hand for that purpose, and that on various occasions at Grand Lodge sessions he borrowed money for the purpose of making the necessary exhibit, at one time showing a certified check and at another time $4,000 in bills, and that after the Grand Lodge session was over he would return the money borrowed and pay off the loan.

[4] We think the evidence fails to show conclusively that McKinney knew of the manner in which Bluitt was using the Grand Lodge funds, or that McKinney knew that the auditing committees appointed at the several sessions of the Grand Lodge had not in fact made the necessary investigation to find out whether Bluitt had on hand as Grand Treasurer the moneys which his books showed him to have. There is evidence to show that at a session of the Grand Lodge held at Houston, Bluitt notified those present who had claims or warrants to be cashed to see him that day; that he was going to leave that night for his summer vacation; that he did leave that night, and that afterwards certain parties complained of their inability to have their warrants cashed. But we do not think the evidence conclusively shows any absconding on the part of Bluitt at said time, or that he was unable to pay said amounts so due, or that McKinney knew that he was not so able. The evidence upon these various matters is conflicting, but the jury has decided the issue of facts favorable to the contention of the plaintiff below, and we do not feel justified in disturbing the judgment based on such verdict.

It will be noted that many of the answers made in the application are as to matters, dealings, and course of conduct in the future, and as to these McKinney as Grand Master could only answer upon his best information and belief as to the course and conduct of Bluitt in the management of the Grand Lodge funds.

[5] But we think it doubtful whether the appellee should be held bound by the answers made over the signature of its Grand Master in the application mentioned. As shown by the evidence the duties of the Grand Master as defined by the Constitution of the plaintiff order were, to preside at all communications of the Grand Lodge, to present at each annual communication a written message recommending legislation, etc., to constitute chartered lodges, to visit lodges, etc. And it is very questionable in our minds as to whether the Grand Master was authorized to furnish the information asked for in this application, and that the Grand Lodge would, because of the giving of such information on the part of the Grand Master, be in any way affected by the truth or falsity of such representations. In the case of American Surety Co. v. Pauly, 170 U. S. 133, 18 Sup. Ct. 552, 42 L. Ed. 997, Mr. Justice Harlan, speaking for the court, held that a bank could not be deemed to have had constructive notice that its president gave a certificate to a bonding company to enable its cashier to procure a bond insuring his fidelity, where it was not the duty or business of the president, and there was no usage of the bank allowing him to give the certificate. There is no pleading in the instant case, nor is there any evidence, that it was the usage of the plaintiff below to have its Grand Master furnish such information. It is shown that it was the Grand Master's duty to approve acceptable bonds when presented. We are of the opinion that the contention of appellant here made should be overruled by reason of the fact that the record fails to show by proper pleading and at least by evidence that in signing this ap-

plication J. W. McKinney was acting within the express or implied scope of his authority as Grand Master.

[6, 7] But irrespective of the condition of the evidence with reference to what the facts were as to Bluitt's having been in default prior to the execution of the bond, or as to the accounting and verification of the books, accounts, etc., of Bluitt as Grand Treasurer or as to the knowledge of McKinney of the facts alleged and relied on by appellant to show that said answers were false in material respects, and were fraudulently made by McKinney, and should we be in error in concluding that the case of Surety Co. v. Pauly, cited above, controls the facts here disclosed, we are of the opinion that the evidence shows a waiver on the part of the surety company of its right to declare the invalidity of the bond on account of the false representations alleged to have been made in the application. Where the insurer in negotiations or transactions with the insured recognizes the continuing validity of the policy, after knowledge on its part of the conditions upon which the claim of forfeiture is based, or if it does acts based on the validity of such policy or requires the insured by virtue thereof to do some act or incur some trouble or expense, the forfeiture is, as a matter of law, waived. The evidence discloses that as late as March 31, 1913, nearly four months after it had been notified of Bluitt's defalcation, the appellant company wrote to McKinney as Grand Master a letter, in which it charged that the answers made by McKinney in the application as to the condition of Bluitt's account with the Grand Lodge at the time of the making of the application for the bond were untrue, and after reciting that notice of default had not been given as stipulated in the bond, and after claiming that the appellant company was thereby relieved of liability on the bond, requested of McKinney that a statement be made up showing every receipt and every disbursement, or at least the total of all disbursements between the commencement of the bond and the date of the alleged default. Mitchell, who was the agent and manager of appellant company, and had occupied a similar position with the Western Casualty & Guaranty Company, testified that he received proof of loss from McKinney about the 1st of January, 1913, and that immediately he began an investigation of the matter; that upon receipt of the letters from McKinney of date December 2, 1912, he spent some six weeks in Dallas investigating the matter, and later saw W. H. McDonald, Grand Secretary. He states that he began the investigation about February 20th, and that it was probably two weeks after that he saw McDonald; that he did business personally with the Guaranty State Bank & Trust Company, and was acquainted with the officers thereof during the years 1910, 1911, and 1912; that when he found there was a claim for $13,000

or $14,000 against his company on this bond, he looked Bluitt up to find out whether he was solvent or not, and whether the company could make the money out of him in the event it had to respond in damages on the bond, and that he found that Bluitt had a good deal of property, but that it was pretty well incumbered.

McDonald testified that Mitchell came to his office and told him that they (the Grand Lodge officers) were laboring under a mistake, and that it had only a $10,000 bond in his company in place of $25,000, and that Mitchell complimented him upon the position he had taken in trying to collect the money by letting Bluitt secure plaintiff with his property, and said that was the way for them to proceed, that they ought to settle it that way, and not go into courts and litigate the matter at all; that he knew that it was a very unfortunate affair; that he knew Bluitt, and that Bluitt stood as high in Dallas as anybody, and that he thought that if Bluitt was given time he would make good; that this conversation occurred some time during the latter part of March, and that during the conversation he asked Mitchell why they had not given them (the Grand Lodge officers) an answer as to what they were going to do about the matter, and that Mitchell replied that they had 90 days in which to make their reply; that he had plenty of time in which to let them know. McDonald further testified:

"I then said to Mitchell that he was over there in Dallas with Bluitt, and asked him why he did not go after Bluitt and make him 'fork up' this money, and Mitchell replied there wasn't a man in the state that had the influence with Bluitt that I had, and that I was the only man in the state that could have any influence with Bluitt; then he went on to say that I was handling the matter very nicely. In my conversation with Mitchell I asked him if we would be justified in going into our Grand Lodge and airing this matter, and he said his advice to us was to settle it amongst ourselves in a brotherly way. He remarked that there were enough negroes in the penitentiary already, and he asked me if I didn't agree with him, and I told him I did, and then he repeated that the proper way to settle it was to settle it among ourselves."

Article 4948, V. S. Texas Civil Statutes, provides:

"In all suits brought upon insurance contracts or policies hereafter issued or contracted for in this state, no defense based upon misrepresentations made in the application for, or in obtaining or securing the said contract, shall be valid, unless the defendant shall show on the trial that, within a reasonable time after discovering the falsity of the misrepresentations so made, it gave notice to the assured * * * that it refused to be bound by the contract or policy: Provided, that ninety days shall be a reasonable time."

In the case of National Life Insurance Ass'n v. Hagelstein, 156 S. W. 353, writ denied, it was held that a company not having given the prescribed notice within 90 days after being informed of the alleged falsity of the representations was absolute-

ly barred from defending an action on the policy because of said alleged misrepresentations in the application.

In the case of German-American Insurance Co. v. Evants, 25 Tex. Civ. App. 300, 61 S. W. 536, writ denied, it was held that the forfeiture was waived where an insurance adjuster knew that the policy had been forfeited by a breach of a condition therein, and, the insured having refused to sign an agreement stipulating that the insurer waived no rights by investigating the loss, the adjuster then stated that he did not waive any conditions, but proceeded to adjust the loss. He required the insured to make a list of the destroyed property, etc., and went away without having claimed a forfeiture, and insured went to the expense of employing lawyers to make out his proofs of loss. See, also, Ætna Life Ins. Co. v. Bethel, 140 Ky. 609, 131 S. W. 523; National Surety Co. v. Murphy-Walker Co., 174 S. W. 997.

The evidence in the instant case shows that as a result of the request on the part of the appellant company, the plaintiff employed an auditor to examine the books, accounts, etc., of Bluitt at an expense of some $180, and that a full report was made by him and submitted to the company. We, therefore, as stated, conclude that this constituted a waiver of any right of forfeiture on the part of the company by reason of the alleged misrepresentations contained in the application, even though it should be held that the plaintiff would otherwise be bound by the statements therein contained. We think the evidence is sufficient to justify the conclusion on the part of the jury that the manner in which Bluitt had deposited the Grand Lodge funds, and the manner in which he had checked on them and used them, was fully disclosed to the appellant company and its adjuster before it demanded an audit of the books, and a statement to be made showing every disbursement, or at least the total of all disbursements, between the commencement of the bond and the date of the alleged default, as required in Mitchell's letter of March 1, 1913. Moreover, if there had been a distinct denial of liability on grounds other than now claimed, according to the authorities this would have been a waiver of notice. In his letter of March 1st, Mitchell stated:

"We have been investigating the facts and are of the opinion that nothing done by B. R. Bluitt amounts, or amounted, to larceny or embezzlement."

In the case of Fidelity Phenix Fire Ins. Co. v. Sadau, 178 S. W. 559, in declining to hold that a forfeiture had been shown, this court said:

"It will be further noted that the letter from the defendant company, worded by an able and experienced lawyer, was so couched as to amount only to a general objection to the proof submitted, if not a denial of liability altogether on the policy. The specific defects now relied on were not pointed out."

In the case of Georgia Home Insurance Co. v. Moriarty, 37 S. W. 628, writ denied (38 S. W. xvii), Chief Justice Rainey of the Court of Civil Appeals for the Fifth District said:

"But it may be asserted broadly that if, in any negotiations or transactions with the insured, after knowledge of the forfeiture, it recognizes the continued validity of the policy, or does acts based thereon, or requires the insured, by virtue thereof, to do some act or incur some trouble or expense, the forfeiture is, as matter of law, waived. And it is now settled in this court that such a waiver need not be based upon any new agreement, or an estoppel. Forfeitures are not favored in the law, and this doctrine of waiver is not peculiar to insurance policies, but is applicable to all cases of forfeiture."

In British America Assur. Co. v. Francisco, 58 Tex. Civ. App. 75, 123 S. W. 1144, writ denied, the following expression is used:

"Treating of the conduct of the insurer after the forfeiture had occurred, it is said in volume 16, p. 839 (2d Ed.) Am. & Eng. Encyc. Law: 'And even after forfeiture occurs the insurer is precluded from taking advantage thereof if with full knowledge of the facts out of which the forfeiture arose it neglects to declare its intention of insisting on the forfeiture, or by its acts recognizes and treats the policy as a valid and subsisting contract, and induces the assured to act in that belief, especially if such acts cause the insured to incur trouble or expense.'"

See, also, Couch & Gilliland v. Home Protection Fire Ins. Co., 32 Tex. Civ. App. 44, 73 S. W. 1077; Sun Mut. Ins. Co. v. Mattingly et al., 77 Tex. 162, 13 S. W. 1016; Burlington Ins. Co. v. Lowery, 61 Ark. 108, 32 S. W. 383, 54 Am. St. Rep. 196.

The statement of facts discloses that in spite of expressions used by the appellant company to the effect that it was relieved of liability by virtue of a failure to give notice within the required time, and on account of misrepresentations alleged to have been made in the application, yet repeatedly insisted upon a course of conduct to be pursued by appellee which necessarily involved trouble and expense.

For all the reasons stated, we are of the opinion that those assignments and propositions leveled at the claimed error of the court in failing to give a peremptory instruction for defendant because of alleged misrepresentations contained in the application should be overruled.

It is insisted that the judgment against the company on the $10,000 bond is erroneous, in that the evidence fails to show that the alleged shortage or embezzlement occurred during the life of the bond. This bond was executed May 31, 1911. The report of the special auditing committee appointed by the Grand Master at the meeting at Ft. Worth on October 5, 1912, showed a shortage on the part of Bluitt of $13,918.06. D. H. Kernaghan, the auditor employed by the appellee, in response to the request of the appellant to furnish a full statement of the

receipts and disbursements of Bluitt during the term of the bond, testified:

"My audit or report shows that on October 26, 1911, the Grand Treasurer had in his hands $151.41; that was his balance on that date—that is, he was charged with that amount on that date. From October 31, 1911, to July, 1912, the Grand Treasurer received $37,671.30. On November 27, 1911, he began to pay out this money, and up to September 30, 1912, he disbursed $24,433.77, which left a balance to be accounted for of $13,388.94. * * * This document here is a correct audit of the books of B. R. Bluitt, the Grand Treasurer, and correctly shows the state of his account during the period of time covered by the audit; it is a faithful audit of the books, and I swear to it."

[9] Even if Bluitt had been short in his accounts prior to the life of this bond, and had borrowed money from banks or individuals to cover this shortage, and after the execution of the bond had used the Grand Lodge funds with which to repay these loans, there being some evidence to this effect, the use or taking of the Grand Lodge funds to pay these loans would be a fresh and independent act of embezzlement or defalcation occurring during the life of the bond and for which the bonding company would be liable. Hence we overrule the assignment directed to this alleged error.

[10] Appellant complains of so much of the judgment as allows 12 per cent. damages on the amount of the loss, together with reasonable attorney fees for the prosecution and collection of such loss, claiming that such penalties are only permitted as against life insurance or accident insurance companies, etc., as provided in article 4746, V. S. Tex. Civil Statutes. This article reads as follows:

"In all cases where a loss occurs and the life insurance company, or accident insurance company, or life and accident, health and accident, or life, health and accident insurance company liable therefor shall fail to pay the same within thirty days after demand therefor, such company shall be liable to pay the holder of such policy, in addition to the amount of the loss, twelve per cent. damages on the amount of such loss together with reasonable attorney fees for the prosecution and collection of such loss."

Article 4955, V. S. Texas Civil Statutes, has been heretofore set out in this opinion. In National Surety Co. v. Murphy-Walker Co., 174 S. W. 997, the Court of Civil Appeals for the El Paso District held that article 4955 was void because the purpose and purport of said article, being section 55 of chapter 108, General Laws 1909, p. 192, was not contained in the caption of the bill, and therefore was in violation of article 3, section 35, of the Constitution of this state, which declares:

"No bill (except general appropriation bills, which may embrace the various subjects and accounts, for and on account of which moneys are appropriated) shall contain more than one subject, which shall be expressed in its title. But if any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed."

The title to the bill under discussion is fully set out in the National Surety Company Case, supra, and need not be repeated here; but it is sufficient to say that said title does not in our opinion contain language which could reasonably refer to or include the purposes contained in section 55 of said act. Nor do we think the purpose therein disclosed is one merely incidental to the general subject referred to in the act. Subsequently, in 1911, section 55 was incorporated by the Legislature as article 4955 in the compilation of Revised Civil Statutes of 1911. The question before us is: Did the legislative act of adopting the compiled laws operate as an enactment or a re-enactment of this particular article, so as to relieve it of its former invalidity? In the case of Fischer v. Simon, 95 Tex. 234, 66 S. W. 447, 882, the Supreme Court, in answer to certified question from the Fourth district, held that the incorporation of former enactments in the Revised Statutes of 1895 should be deemed but a continuation of former laws, and that it will receive the same construction which would be given to the original act. In Insurance Co. v. Walker, 94 Tex. 473, 61 S. W. 711, the same conclusion was reached by our Supreme Court in a well-considered opinion by then Associate Justice Brown. From this opinion the following language is taken:

"The commissioners for revision were not authorized to make changes in the substance of the statute laws of the state, but simply to arrange them in convenient form. To make sure that the laws of the state were not materially changed by such revision, the Legislature which adopted the Code as revised enacted a chapter of general provisions to govern in the construction and application of the laws embraced in the Revised Statutes, * * * of which general provisions section 19 is in these words: * * *" (Then quotes the section which is in the same verbiage as section 16 of the final title of the bill adopting the Revised Statutes of 1911 and above quoted.)

In Corbett v. Sweeney, 151 S. W. 858, writ denied, the Court of Appeals for the First District held that the same rule of construction as applied by the Supreme Court in the two cases above mentioned with reference to the Revised Statutes of 1895 should apply to the Revised Statutes of 1911.

In view of the state of authority on this question here presented, we feel compelled to hold that the adoption by the Legislature of the Compiled Civil Statutes of 1911 did not give to article 4955 any constitutional validity which it did not have as section 55, chapter 108, of the General Laws of 1909, and that, therefore, said article must be held to be void under article 3, section 35, of the Constitution of this state. Hence we sustain the sixteenth assignment of error which is leveled at so much of the verdict and judgment as authorized a recovery of attorney's fees and the 12 per cent. penalty. All other assignments are overruled.

The judgment will be reformed so as to exclude the items of 12 per cent. penalty and

the attorney's fees adjudged against the appellant Western Indemnity Company, and, as so reformed, will be affirmed. The judgment against appellant Bluitt will be in all things affirmed. Costs of appeal taxed against appellee.

