SOUTHERN SURETY CO. v. CITIZENS'
STATE BANK OF HEMPSTEAD.*
(No. 7646.)

(Court of Civil Appeals of ·Texas. Galveston.
March 14, 1919. Rehearing Denied
April 3, 1919.)

1. INSURANCE ☞2—CONTRACTS—CONSTRUCTION—FIDELITY OR GUARANTY BOND.

Fidelity bonds issued by a surety company to a bank, in consideration of premiums paid, indemnifying the bank against defalcation of its cashier, are insurance contracts, though such bonds recite that the cashier is principal and the surety company surety, the bonds containing an express obligation running from the cashier to the surety company to reimburse the latter for any loss suffered.

2. INSURANCE ☞151(2) — FIDELITY INSURANCE — AGREEMENTS NOT PART OF CONTRACT.

Under Rev. St. art. 4951, requiring insurance policies to be accompanied by copies of the application and a copy of all questions asked, a written agreement and representations not complying with these requirements, made by the president of a bank contemporaneously with the issue of a fidelity bond to the bank by a surety company, is not a good defense in an action for breach of the bond.

3. INSURANCE ☞390—FIDELITY INSURANCE—ACTIONS—DEFENSES—REPRESENTATIONS BY INSURED.

A surety company, upon being sued by a bank for breach of a fidelity bond, cannot, in view of Rev. St. art. 4948, interpose as a defense · representations by the bank's president that the books of the cashier had been found correct, where it was not shown that the company ever notified the bank of refusal to be bound because thereof or set them up in defense at all until the filing of its amended answer, more than one year after commencement of suit.

4. INSURANCE ☞624(2) — FIDELITY INSURANCE—ACTION ON BOND—RIGHT TO MAINTAIN ACTION.

A bank may maintain a suit against a surety company to recover upon fidelity bonds the amount of its cashier's defalcations, although the directors have already refunded the money to the bank, the bank still retaining legal title to the bonds, and the surety company claiming no defense under the bonds as against the directors, who are not complaining.

Appeal from District Court, Waller County; J. D. Harvey, Judge.

Action by the Citizens' State Bank of Hempstead against the Southern Surety Company and A. G. Tompkins. From a judgment for plaintiff, the Surety Company appeals. Affirmed.

John Speed Elliott, of Houston, Keet McDade, of Hempstead, and G. P. Dougherty, of Houston, for appellant.

Sam'l Schwartz and Meek & Kahn, all of Houston, for appellee.

GRAVES, J. On November 12, 1909, the appellant surety company issued to the appellee bank a bond for the sum of $5,000 guaranteeing the faithful performance by A. G. Tompkins of his duties as the bank's cashier, reciting upon the face of it that this bond was "in lieu, instead of, and as a substitute for" a prior and similar bond between and concerning the same parties, of like amount, and of date January 10, 1908. By what were termed "renewal certificates" the bond was kept in force until January 1, 1913.

Alleging that the conditions of both bonds had been breached, and that during the time they were in force the cashier had wrongfully procured and taken the total sum of $6,507 of its funds, the bank brought this suit against the surety company and Tompkins upon the bonds, attaching copies thereof to its petition, asking judgment against the company for the amount of the bond, together with interest, a statutory penalty, and reasonable attorney's fees thereon, but against Tompkins only "for the difference between the amount found to have been embezzled by him and the $5,000 due plaintiff by appellant surety company."

The evidence showed that the amount of the bank's moneys taken or abstracted by the cashier during the time the two bonds were in effect, that is, between January 10, 1908, and January 1, 1913, aggregated $5,582, and that between January 1 and July 25, 1913, he took $925 more.

In defense, after presenting the general issue through both demurrer and denial, the surety company specially pleaded: First, that contemporaneously with the original bond of January 10, 1908, there had been a written agreement between it and the bank, acting by the president, L. L. Mahan, in which it was stipulated that the books, accounts, securities, and cash of the bank to be in charge of and handled by the cashier should be examined and checked by its board of directors once a month and by a state bank examiner twice each year, which undertaking had not been carried out by the bank, and that, if it had been, the defalcations complained of would have been promptly discovered; second, that in January, 1909, 1910, 1912, and February, 1911, President Mahan made certificates representing that the books and accounts of the cashier had been examined and found correct, all moneys accounted for, and his duties performed in an acceptable manner; that these representations were made to and did in fact induce

the surety company to renew and keep the bond sued on in force, but that they were untrue and false in that no such examinations were made; third, that soon after discovery of the defalcations the directors paid into the bank all the money so taken, and consequently, at the time of the trial, no cause of action existed in the bank to recover the same. There was also a plea of four-years limitation interposed.

Among others, the bank specially excepted to these defensive matters upon the grounds: (1) That it was neither alleged that President Mahan was authorized to bind the bank in making the agreement set up, nor that it was attached to, written in, or otherwise in any manner made a part of the bond contract sued upon; (2) that the alleged refunding of the money to the bank by its directors was irrelevant and immaterial, and would not, if true, relieve the surety company of the obligations imposed upon it by the bond, in that it was not alleged that the bank had in any manner parted with the legal title to its claim under the bond. These two exceptions were sustained, and the defensive averments at which they were leveled stricken from the surety company's answer, against which action the first five assignments of error presented in this court are directed.

At the close of the trial a verdict was instructed in the bank's favor against Tompkins for $500 and against the surety company for the full amount of the bond, $5,000, with interest and a 12 per cent. penalty thereon; the question of whether or not it was also entitled, as against the surety company, to reasonable attorney's fees, and, if so, in what amount, being the sole issue submitted to the jury On the return of the verdict otherwise responsive to the charge, finding attorney's fees to be due, and fixing $1,000 as a reasonable sum therefor, judgment was accordingly entered against Tompkins for the $500, and against the surety company for the aggregate amount of $6,927.50. The surety company alone appeals.

Since the bond of 1909 was the real basis of the suit and of the claimed liability, being so in lieu of and in substitution for the former one of 1908 and well-nigh all the discrepancies occurring while it was in force, no point is made by either party upon any differences in purport and effect between the two, the latter being mainly, if not solely, relevant because of being the initial obligation and of the surety company's previously mentioned averments concerning the contemporaneous agreement as to examinations of the bank's books, accounts, etc.; so that the rights of the parties and the real meaning of their agreement may properly be said to mainly, if not wholly, depend upon a proper construction of the bond of 1909.

[1] In declaring upon its cause of action the bank alleged that, as between it and the surety company, the two bonds constituted contracts of indemnity and fidelity insurance. The trial court adopted that theory, held them subject to the same rules of construction as apply to other kinds of insurance, and, in so far as within their terms, to be controlled by the provisions of our statutes relating to insurance.

If this holding is correct, there can be little doubt that the judgment should be affirmed; indeed, we do not understand appellant to entertain a different view, its contention being, as stated at page 37 of its brief:

"We do not think the court will hold the contract under consideration to be a policy of insurance, and not a contract of indemnity, for the reason that the bond creates the relationship of principal and surety, as between Tompkins and the surety company, secondary liability for the misconduct of Tompkins, and this relationship, having been created by the express contract of the parties, should not and cannot be ignored."

This position is stated immediately after a concession that the Courts of Civil Appeals at El Paso and Ft. Worth, in the cases of National Surety Co. v. Murphy-Walker Co., 174 S. W. 997, and Western Indemnity Co. v. Free and Accepted Masons, 198 S. W. 1092, have held fidelity bonds of the same general nature as those here involved to be policies of insurance; it is said, however, that the reasoning in those cases is unsound and the opinions in conflict with the holding of the Supreme Court in Lonergan v. San Antonio Trust Co., 101 Tex. 77, 104 S. W. 1061, 106 S. W. 876, 22 L. R. A. (N. S.) 364, 130 Am. St. Rep. 803. In the first place, it is thought appellant misapprehends the meaning and effect of this bond as between the bank and itself. It is quite true that the cashier, or "officer," is at the beginning therein referred to as principal and appellant, or, "the company," as surety, under the recitation that "we" are held and firmly bound to the bank in the penal sum of $5,000, but the context of the entire instrument clearly shows, we think, that this was merely a matter of description, or of convenience in designation, and that the plain purpose and intent was to create a direct and primary obligation from the surety company to the bank to in that manner pay any loss the bank might sustain as a result of the cashier's unfaithfulness; the main provision of the bond was:

" * * * The conditions of the above obligation are as follows:

"That whereas, the said officer is in the service of the bank, in the city of Hempstead, county of Waller, Texas, holding the position of cashier:

"Now, if the above-bounden officer shall well and faithfully perform all the duties of his

office or employment, and if the company shall hold the bank harmless against, and pay to it such pecuniary loss as it may sustain of money, or other valuable securities embezzled, wrongfully abstracted, or willfully misapplied by said officer in the course of his employment as such, and in the course of his employment in any other position in which he may be appointed, reappointed, elected or 're-elected, or temporarily assigned, then this obligation is void; otherwise to be and remain in full force and effect."

There then follow a number of subsidiary undertakings between the company and the bank, more or less reciprocal, but beyond this first and formal recitation that Tompkins was principal and the company surety the bond does not impose any obligation whatever upon Tompkins to the bank; it does, however, bind him to the surety company just as directly as it is obligated to the bank, in the following concluding provision:

"And the officer doth hereby, for himself, his heirs, executors, and administrators, covenant and agree to and with the company that he will save, defend, and keep harmless the company from and against all loss and damage of whatsoever nature or kind, and from all legal and other costs and expense, direct or incidental, which the company shall or may at any time sustain or be put to (whether before or after any legal proceedings by or against it to recover under this bond, and without notice to him therefor), or for, or by reason or in consequence, of the company having entered into the present bond."        •

It would seem, therefore, that both the purpose and effect of the cashier's joining as principal in the manner thus shown by the terms of this bond was the creating of an express obligation from him in turn to the surety company, and not the acknowledgment of merely a secondary liability from the latter to the bank, as is contended.

In further statement of the nature of and the conditions under which this contract was made, it may be said to be conceded that appellant is a corporation, chartered for the purpose and engaged in the business of writing and issuing for a consideration called a "premium" what are commonly called "surety or fidelity bonds," by the terms of which it undertakes to indemnify employers against any loss that may be sustained by reason of the dishonesty of employés.

The obligation of the surety company to the bank being,ᐧ then, as we conceive it, a direct and primary agreement to pay, in the amount specified, any sums wrongfully taken or misapplied, our further conclusion is that the trial court did not err in holding the transaction to be an insurance contract; neither can we agree with appellant that the same determination by the Courts of Civil Appeals at El Paso and Ft. Worth in the two cases above referred to, which it evidently followed, conflicts with the decision of our Supreme Court in Lonergan v. San Antonio Trust Co., 101 Tex. 76, 104 S. W. 1061, 106 S. W. 876, 22 L. R. A. (N. S.) 364, 130 Am. St. Rep. 803. A very different question was there determined, as this court's review of the case in Texas Fidelity & Bonding Co. v. Rosenberg Ind. School Dist., 196. S. W. discloses, where at page 367 it is said:.

"The Lonergan Case, decided by our Supreme Court, is likewise plainly distinguishable from this one. In so far as the surety company was concerned, there was but a single question decided in that case also, which was as follows: 'We conclude that the changes made in the contract, without the consent of the American Surety Company, operated to discharge that company from liability upon the bond.'

"The contract provided: 'No alterations or extra work to be done except upon the price and additional time necessary to complete the same being agreed upon beforehand, and indorsed upon the contract.'

"The court found that a number of such material changes as to destroy the contract as made and to substitute a new one, for which the surety company had not contracted to be responsible, were in direct violation of this provision in the bond made before abandonment òr completion of the work by the contractors, without the surety company's knowledge ond consent, and, as above quotation from the opinion shows, upon this ground alone held it not bound. By way of argument in reaching that conclusion, different subsidiary propositions are discussed and decided, among them that there is no difference in the rights of a compensated and a voluntary surety; but the single conclusion stated, and the given foundation of fact upon which it rested, is all the case decides as affects the liability of the surety company."

Inasmuch, therefore, as the Supreme Court has not passed upon the particular question, so far as we are advised, and believing the prior determination of it by the two Courts of Civil Appeals in the cases cited to be sound, we are content to follow their holding without attempt to add anything of value by independent discussion.

As above indicated, it is thought this conclusion practically determines the merits of this appeal and renders detailed consideration of the various subsidiary and purely dependent questions raised, such as those concerning the recovery of interest, penalty, and attorney's fees, unnecessary. In each of these instances authority was drawn from some provision of the statute relating to insurance.

[2] Article 4951 of chapter 15, tit. 71, of our Revised Statutes, relating to insurance, which, having been passed in 1903, was in force at the time the bonds at issue here were executed and delivered, in part provides:

"*Policies of Insurance to be Accompanied by Copy of Questions, etc.*—Every contract or policy of insurance issued or contracted for in this state shall be accompanied by a written, photographic or printed copy of the applica--

tion for such insurance policy or contract, as well as a copy of all questions asked and answers given thereto."

It was not even alleged that the above-described contemporaneous agreement set up by the surety company, as the bank's special exception thereto pointed out, met any one of these requirements, and the undisputed proof showed that it in fact did not, neither of the bonds sued upon being accompanied by a written, photographic, or printed copy of any such agreement, nor of any of the questions alleged to have been asked of and answered by the bank's president in connection with and as part thereof. For a construction of this article, and a holding as to the effect of failure to comply with its provisions, see N. L. Association v. Gomillion, 178 S. W. 1050.

[3] In so far as the certificates and representations alleged to have been made by President Mahan were concerned, it was neither averred nor shown that the appellee was ever notified that appellant refused to be bound by the contract because of them, nor, indeed, did it ever set them up as a defense at all until the filing of its amended answer on October 22, 1917, when it had been notified of the loss on August 14, 1916, and sued therefor on September 20, 1916. In these circumstances, the plain provisions of article 4948, Revised Statutes, which was likewise a part of the act of 1903, barred the interposition of any defense based upon the misrepresentations claimed.

[4] The objection that no cause of action existed in the bank at the time of the trial to recover the amount of the cashier's defalcations, because of the charge that its directors had themselves already refunded the money to the bank, is not thought well taken, since it is neither alleged, nor did the facts show, that the legal title to the bonds had ever passed out of the bank; moreover, the surety company claimed no defense under the bonds as against the directors, not even making them parties to the suit; neither does it appear that they are in any way complaining. In the case of Allison, Bailey & Co. v. Insurance Co., 87 Tex. at page 595, 30 S. W. 547, our Supreme Court says:

"It is a general rule applicable to all written contracts that he who has the legal title may maintain an action upon it, notwithstanding another may have the equitable right to the proceeds of it when collected."

That rule, having been applied by the Supreme Court to actions upon both life and fire insurance policies, is thought to fit the situation here.

The conclusions stated dispose of all matters assigned in this court as error. Believing that, under the pleadings and evi-dence, the court below made proper disposition of the case, its judgment is in all things affirmed.

Affirmed.

