UNITED STATES FIDELITY & GUARANTY CO. v. THOMAS

---

(June 6, 1930. Opinion and Decree.)
(July 1, 1930. Rehearing Refused.)
(July 19, 1930. Writ of Certiorari and Review Refused by Supreme Court.)

---

Spearing & Mabry, of New Orleans, attorneys for plaintiff, appellant.

Harold A. Moise, of New Orleans, attorney for defendant, appellee.

WESTERFIELD, J. The defendant in this case is one of several individuals against whom the present plaintiff has brought a similar suit. The issues here are the same as appear in the case of U. S. Fidelity & Guaranty Company v. Gustave H. Crais, 13 La. App. 691, 127 So. 414, decided April 7, 1930, and now pending on application for rehearing. The correctness of our former decree is challenged and plaintiff's right to recover in both instances is vigorously presented by the same able counsel.

· A short restatement of the facts is advisable.

J. E. Johnson, an employee of the Canal Commercial Trust & Savings Bank, defaulted for a considerable sum of money. The bank had taken out a bond or policy with the plaintiff company called a "Banker's Blanket Bond." This bond among other stipulations undertook to indemnify the bank against loss caused by (a) "any dishonest act" committed by its employees "alone or in collusion with others"; (b) "through robbery, burglary, larceny, theft, hold-up, or destruction" of its property while on the bank's premises or in possession of correspondent banks within the United States, etc.; and (c) "through robbery, larceny, theft, hold-up by whomsoever committed while the property is in transit within twenty miles of the insured's office." The limit of the assurer's liability under the bond was placed at the sum of $200,000, and the consideration therefor was "an annual premium" in the sum of $13,500. Johnson being one of the bank's employees, his defalcation obviously resulted in an obligation under the bond on the part of the plaintiff to make restitution of the shortage to the bank, which obligaiton it promptly and properly recognized.

It appears that Johnson was possessed of some property or effects and he was prevailed upon to transfer his assets to the plaintiff to partially indemnify it for its loss under its policy with the bank. In addition a number of Johnson's friends,

including the present defendant who signed for $2,000, entered into an agreement whereby each agreed:

"In consideration of the discharge by the United States Fidelity & Guaranty Company, of its liability to the Canal-Commercial Trust and Savings Bank of New Orleans, as surety for and on account of J. E. Johnson, Manager of the LeBreton Market Branch of the Canal-Commercial Trust & Savings Bank of New Orleans, the undersigned bind and obligate themselves to pay to the United States Fidelity & Guaranty Company the amounts set opposite their respective names, or so much thereof as may be necessary to refund to and reimburse the said company for any loss, damage or expense, resulting from and growing out of the bond hereinabove referred to, subject, however, to the following conditions and provisions, to-wit:

"1. The amount of liability of the United States Fidelity & Guaranty Company shall be ascertained by an audit of the books of the said bank for a period not extending beyond the term of employment of the said Johnson, which audit is to be made in the presence of the said Johnson."

When called upon, defendant failed to pay, and this suit resulted.

Of the several defenses pleaded, want of consideration was mainly relied upon and prevailed below.

Judge Cage, in deciding this case in the district court, used the following language in his reasons for judgment:

"The contract was one of insurance, pure and simple and the loss incurred under paragraph "A", which I quoted above and again quote "through any dishonest act committed by any employee, etc." and the liability of the Insurance Company was the same as if the loss had arisen through robbery, burglary, larceny, theft, hold-up or destruction and had the bank been burglarized and had the burglar abstracted over Thirty Thousand dollars of the Bank's cash and had the burglar been identified and arrested, is it possible that any human being would say that the insurance company was the surety for the burglar and it is plain, if it was not the surety for the burglar, neither was it the surety for the defaulter.

"Therefore, we find that all that the Insurance Company agreed to do was to pay the insurance loss which it had suffered and which, under its contract of insurance it was bound to pay.

"It is equally clear that it did nothing that it was not forced to do and it refrained from nothing.

"Counsel for the Insurance Company suggests to me that the Insurance Company could have compromised with the Bank. If so, what benefit whatever would Johnson have derived therefrom. Johnson was obligated to the bank ex delicto. His act was an offense denounced by the Criminal Law, but the amount of money he took by his derelict rendered him, by article 2315 of the Code, obliged to repair the damage.

"Now, it is perfectly plain that when the Insurance Company did pay to the bank the amount of Johnson's defalcation, it thereby acquired no right as against Johnson any more than an insurance company which insures a house against fire has any claim against the arsonist who burns the house down, when it pays the obligation of its insurance.

"It is perfectly plain to me, therefore, that when Johnson robbed the bank he became, under Article 2315 of the Code, obligated to the Bank to repair the damage which he had caused and this obligation of Johnson, in my opinion, was in no respect discharged by the payment of the insurance money under the policy of insurance and it would have no right, notwithstanding the payment by the Insurance Company of the amount due under its policy, to have sued and recovered judgment against Johnson for the full amount of his defalcation and Johnson's obligation, although barred against suit by the lapse of one year, is still an existing obligation on his part to the bank.

"Therefore, it is plain to me that the defendant, Thomas, received no consideration whatsoever—certainly none to himself and certainly nothing for the benefit of a third person, to-wit, Johnson.

"I am, therefore, of the opinion that the defense of want of consideration is per-

fectly well taken and for these reasons there will be judgment in favor of the defendant, dismissing the plaintiff's suit at its costs."

Counsel criticises this conclusion of Judge Cage, with which our opinion in the Crais case was in accord, saying:

"The opinion of Judge Cage and the brief of the attorney for the defendants based entirely and exclusively on the opinion of Judge Cage, and with all due deference, the opinion of Your Honors in the Crais case at least intimates that the obligation of the surety company to the bank is one of insurance. Nothing could be further from the true facts and conditions. There is not, we earnestly urge, the first semblance of insurance any more than on any other contract of suretyship the surety insures the obligee. The contract between the bank and the surety company is one of indemnity or suretyship beyond any possibility of question or doubt."

The contention is that the bank's contract with plaintiff was one of suretyship, and that, when the plaintiff paid Johnson's shortage to the bank it was legally subrogated to the bank's claim against Johnson, because of articles 2161 and 3052, R. C. C., to the effect that subrogation takes place by right "for the benefit of him who, being bound with others, or for others, for the payment of the debt, had an interest in discharging it." This is true, the argument proceeds, whether the surety has been given with or without the knowledge of the debtor. Johnson being indebted to plaintiff, his indebtedness was sufficient consideration to support the agreement of his friends including defendant, because a promise to pay a debt of another is a sufficient consideration. Flood v. Thomas, 5 Mart. (N. S.) 560; New Orleans & Carrollton Railroad Company v. Chapman, 8 La. Ann. 97; Pothier, Traite des Obligations, 1st. volume, p. 367, "Du Pact Constitutaes Pecuniae."

It is conceded, as indeed it must in view of the authorities referred to in our opinion in the former case particularly Carr'ell & Company v. New Orleans, Jackson & Great Northern R. R. Company, 26 La. Ann. 447, that, if the contract between the plaintiff and the bank is one of insurance, there can be no recovery because an insurance company, which pays a loss to its assured, is not legally subrogated to its claim against the party who caused the loss. No conventional subrogation is alleged or proven, though a statement appears in counsel's brief, we take it entirely by inadvertence, claiming a conventional subrogation. In any event, that question is not before us.

Plaintiff's case rests solely upon the alleged legal subrogation to the bank's claim against Johnson by reason of having paid the amount of Johnson's defalcation to the bank, for, if not subrogated to the bank's claim against Johnson, there was no consideration for this contract with Johnson's friends, which is the basis of this suit. If the plaintiff was Johnson's surety and the contract one of suretyship, under the plain terms of the Civil Code plaintiff was subrogated, but if the contract was one of insurance there was no subrogation. The issue depends upon the character of the contract with the bank.

We find the following definition of "insurance" in Ruling Case Law, vol. 13, p. 839:

"Insurance is a contract whereby one undertakes to indemnify another against loss, damage or liability, arising from an unknown or contingent event."

In the instant case the bank paid $13,500 a year for indemnity against loss caused by dishonesty of its employees, numbering three or four hundred men and women. The indemnity happened to be equal to the loss sustained by the bank, but the contract

might just as well have provided for a double indemnity, or for a partial indemnity, or for any character of payment which might be agreed upon. It does not appear from the record that Johnson was aware of the existence of the contract between the bank and the plaintiff, but, whether he was or not, he had nothing whatever to do with its terms and was under no obligation to the bank by reason of any stipulation in the bond. It is said that Johnson's knowledge of the existence of the contract did not affect its character as one of suretyship and that the liability of the plaintiff surety company was secondary, Johnson being the primary obligor. In other words, the surety company was only bound for Johnson's debt. It is difficult to see how Johnson owed any debt to the bank, the discharge of which the surety company guaranteed. Counsel says that his integrity was involved, that he owed the obligation of remaining honest, and it was this obligation which the surety company guaranteed. Even in this rather fanciful view the bond does not guaranty the honesty of the employees of the bank, but simply undertakes to pay losses caused by their dishonesty; consequently, if the bank is a guarantor, Johnson must be considered to have obligated himself to pay the bank damages caused by his own perfidy.

· It will be noticed, however, that the obligation of the surety company is not secondary but primary, but even if Johnson and all the other employees of the bank had been called principals and the bonding company named as surety, the situation would not be different because the essential character of the contract is one of insurance and not of guarantyship or suretyship.

In the case of Southern Surety Company v. Citizens' State Bank of Hempstead, 212 S. W. 556, 557, the Court of Civil Appeals of Texas, in considering the same contention that is made here to the effect that the contract involved was one of suretyship and not of insurance, with respect to a bond in which the defaulting cashier of the bank was named in the bond as principal and the surety company as surety, said:

"In the first place, it is thought appellant misapprehends the meaning and effect of this bond as between the bank and itself. It is quite true that the cashier, or 'officer,' is at the beginning therein referred to as principal and appellant, or, 'the company,' as surety, under the recitation that 'we' are held and firmly bound to the bank in the penal sum of $5,000, but the context of the entire instrument clearly shows, we think, that this was merely a matter of description, or of convenience in designation, and that the plain purpose and intent was to create a direct and primary obligation from the surety company to the bank to in that manner pay any loss the bank might sustain as a result of the cashier's unfaithfulness."

In Laws on Insurance by Joyce (2d Ed.) p. 818, we find the following:

"Fidelity guaranty bonds or contracts constitute insurance. The bonds or contracts of those companies which guarantee the fidelity of employees and which make the business one for profit are essentially insurance contracts. This is well settled, not only by express adjudications but also inferentially by those decisions where these contracts are involved but where the point is not discussed as it is evidently conceded by the contract being dealt with as one of insurance. So a bond given to indemnify a county treasurer against loss occurring through acts of a deputy treasurer is to be treated as a contract of insurance and is to be construed against the insurer, as the rule stictissimi juris does not apply to a surety for hire. It is declared in a Georgia case that, under the Code there is a well recognized difference between a contract of suretyship and of guaranty, but it was not necessary to determine whether the contract involved was one of

suretyship or of fidelity insurance as it possessed some of the features of both and that point was not the real question in issue.

"In the Federal supreme court the rule of construction governing insurance contracts is applied to fidelity guaranty contracts. And in the lower Federal court a bond guarantying against loss and dishonesty of a cashier of a bank is in effect one of insurance although the attitude of a "surety" is assumed by the form, and it is also determined that the law of insurance applies by analogy. In Arkansas a bond insuring the fidelity of an employee issued by a paid surety is not an ordinary obligation given by a surety, but is an indemnity bond in the nature of a contract of insurance. It is also declared in Illinois that guaranty insurance by whatever name called is an insurance contract, and in that state guarantying the fidelity of officers and the performance of contract is insurance within a statute excepting insurance business from those for which corporations may be formed, although such insurance is of a kind not known at the time of the passage of the enactment and provision is made in another statute for corporations to transact all kinds of insurance then known. In Kentucky the contract expressed in a fidelity bond is but a form of insurance within the rule that ambiguities must be construed most strongly against the insurer. It is also decided in that state that such contracts are those of insurance, and are equally, as well as policies of life and fire insurance within a statute as to representations and warranties. Under a Michigan decision a bond for indemnity against loss through default of an employee makes the surety an insurer in all essential particulars and subject to the same rules as fire and life insurance companies in regard to a general agent's authority. So in Missouri these companies are classed as insurers and their contracts interpreted by the rules applicable to ordinary insurance contracts. Under a North Carolina decision a fidelity indemnity bond, given by a surety company, which in its form and essence resembles an insurance contract and differs materially from the ordinary forms of bonds should be placed in the general class of insurance policies, at least so far as the same general principles of construction apply. In Tennessee employers' indemnity or fidelity bonds are contracts of insurance and a fidelity corporation is an insurance company within the statute of that state imposing a privilege tax on insurance companies and a statute as to representations and warranties also applies to such fidelity bonds. In Texas the rule of construction against the insurer applies to fidelity indemnity contracts. So in Wisconsin bonds of this character have all the essential features of insurance contracts, so as to make the rule of construction against the insurer applicable."

See, also, Laws of Guaranty Insurance, by Frost, sec. 1.

"A contract to indemnify an employer against any breach of fidelity on the part of an employee is regarded as a contract of insurance in Fidelity & Casualty Co. v. Eickhoff, 63 Minn. 170, 65 N. W. 351, 30 L. R. A. 586, 56 Am. St. Rep. 464, though the issue was not directly raised. In People ex rel. Kasson v. Rose, 174 Ill. 310, 51 N. E. 246, 44 L. R. A. 124, the question was directly considered, however, and it was held that contracts to guaranty the fidelity of persons holding places of public or private trust are contracts of insurance." Cooley's Briefs on Insurance (2d Ed.) vol. 1, p. 17.

"The distinction between ordinary contracts of suretyship or guaranty and contracts of guaranty insurance has not been very clearly drawn. It would seem, however, that one line of distinction is that in most ordinary contracts of guaranty the guarantor obligates himself to do the act if the principal fails, while in guaranty insurance the guarantor—that is, the insurance company—agrees to indemnify the insured for any loss he may sustain due to the failure of the principal to act. Weightman v. Union Trust Co., 208 Pa. 449, 57 A. 879; Equitable Trust Co. v. National Surety Co., 214 Pa. 159, 63 A. 699, 6 Ann. Cas. 465. See, also, Southern Surety Company v. Citizens' State Bank (Tex. Civ. App.) 212 S. W. 556." Supra, p. 16.

The contract itself refers to the bank as

the "insured" and the consideration as "an annual premium," a fairly persuasive circumstance of how it was regarded by the parties at the time.

Moreover the expressed consideration mentioned in the agreement, upon which this suit is based, was "the discharge of the United States Fidelity & Guaranty Company of Its liability (not Johnson's) to the Canal Commercial Bank of New Orleans." It is doubtful whether the surety company would have been willing for the contract to provide for the payment of Johnson's debt as a consideration for the obligation of his friends. The evidence in the case indicates very clearly that the purpose which animated Johnson's friends in signing the obligation was to prevent a prosecution of Johnson. This, of course, was not agreed to by counsel who prepared the agreement for the surety company. All that he would say in that regard was that his client was not interested in the prosecution, but as to the requested assurance he testified that he answered "positively and definitely and unequivocally and unmistakably that we must not make any such terms directly or indirectly, and if that was the purpose of the meeting we cannot proceed." As a matter of fact, however, Johnson was prosecuted.

It is apparent that the parties to the banker's bond, the surety, and the bank regarded their contract as one of insurance, and that the parties to the contract between Johnson's friends and the surety company agreed that the consideration for the payments to the surety company by Johnson's friends was the payment of the surety company's debt to the bank and not Johnson's.

The contract between the surety company and the bank being one of insurance, the payment of the bank's loss under the policy did not result in a legal subrogation of the right of the bank against Johnson, consequently Johnson was not indebted to the surety company, and his friends, including the defendant, who signed the agreement sued on in this case, did so without consideration because the only pretended consideration was the alleged debt of Johnson to the surety company. The contract, therefore, being without consideration, can have no effect, and this suit must fail.

For the reasons assigned, the judgment appealed from is affirmed.

JANVIER, J. (dissenting). In addition to the reasons given in my dissenting opinion in U. S. Fidelity & Guaranty Co. v. Crais, 127 So. 414, I now desire to present what I consider further sound objections to a decree in favor of defendant.

The surety company executed in favor of the bank an indemnity agreement under which it undertook to make good any loss sustained by the bank as a result of two different main classes of criminal acts: First, defalcations of employees; second, robberies, holdups, etc., by third persons. The bond thus partook of two characters. So far as it guaranteed against loss caused by criminal acts of employees, its purpose was to insure the bank against loss caused by persons known to, and connected with, the bank. Thus, so far as those persons, the employees, were concerned, it was an agreement that the surety would stand behind and be responsible for the acts of certain particular persons contemplated by the contracting parties. In the majority opinion it is held that the contract was one of insurance and that the subrogation in favor of the insurer and against Johnson, the defaulting employee, did not take place as a matter of right. It is my belief that my associates have fallen into error by

their conclusion that, because the text-writers and the authorities hold that such a contract is in its main features one of insurance, none of the rights which a surety usually has flow out of that contract. I readily concede that it is an insurance policy in the sense that it created a direct obligation which the insured was bound to discharge, regardless of any attempt by the bank to first collect from Johnson. In my opinion all of the cases cited in the brief of the defendant and in the majority opinion simply hold that the insured, in this case the bank, may proceed directly against the insurer, in this case the plaintiff, United States Fidelity & Guaranty Company, but none of them holds that there does not result from the payment by the surety a subrogation in its favor against the person who caused the loss. For instance, in the supplemental brief filed by the defendant, we find cited the case of First National Bank v. U. S. Fidelity & Guaranty Co., 150 Wis. 601, 137 N. W. 742, in which the court held: A fidelity bond indemnifying against dishonesty is essentially an insurance contract guaranteeing payment, and is not a mere guaranty of collection upon which the insured can recover only after exhausting his remedies against those primarily liable.

And in Southern Surety Co. v. Citizens' State Bank of Hempstead (Tex. Civ. App.) 212 S. W. 556, 557, which is relied on in the majority opinion, the court said:

"The plain purpose and intent was to create a direct and primary obligation from the surety company to the bank."

It is manifest that the question of the right to subrogation was in no way involved, but only the question of whether or not the insured must first attempt to collect his loss from the employee. The majority opinion relies on the text-writers and contains quotations from Joyce to the

effect that a fidelity bond is an insurance contract. As I have already said, I find no fault with that statement, but I call attention also to the statement in Joyce on the Law of Insurance, vol. V, p. 5927, that:

"In fidelity and guaranty insurance the obligation of the insurer to indemnify the insured employer is co-extensive with said insurer's right to indemnity from the employee for payments made to insured by reason of the employee's fraud or dishonesty."

To the same effect we find, in Cooley's Briefs on Insurance (2d Ed.) vol. VII, p. 6700:

"Although a surety issues a bond for the protection of an employer against the defalcation, etc., of an employee, and the signature of the employee does not appear thereon, the company is subrogated to all the rights of action against such employee which the employer would have, and any action against the defaulter would be as well founded as though brought on his express agreement to repay."

To the same effect, see Corpus Juris, vol. 33, p. 43, sec. 714:

"Where, however, the contract is to be regarded as one of indemnity, the company, on payment of the loss, is subrogated to all of the rights of insured against the person whose fault or negligence caused the loss."

But whatever may be the jurisprudence in the other states, it seems very plain to me that the rights as between the surety and Johnson are governed by the Civil Code of Louisiana, which, in article 2161, grants the subrogation as a matter of right, as I shall hereafter show.

Therefore, whether he knew it or not— and from the nature of his employment (he being the manager of a branch department) I am convinced that he did know it —Johnson was in effect one of the principals in the blanket bond and the United

States Fidelity & Guaranty Company was the surety.

Even if it be conceded that Johnson did not know that there was a surety who was responsible for his peculations, the United States Fidelity & Guaranty Company was none the less his surety, because Civ. Code, art. 3038, provides:

"A man may be surety without the order or even the knowledge of the person for whom he becomes surety."

The surety company was, therefore, surety for Johnson.

There is no dispute over the fact that Johnson was guilty of criminally defrauding his employer, the bank, and that thus the surety company became liable to the bank for Johnson's shortages. Therefore, when the surety paid the bank it had its recourse against Johnson because, under Civ. Code, art. 3052, "the surety who has paid the debt, has his remedy against the principal debtor, whether the surety has been given with or without the knowledge of the debtor."

See, also, C. C. art. 3053, "with regard to that remedy (3052), the surety has the same right of action and the same privilege of subrogation, which the law grants to co-debtors in solido."

Even if it be conceded that there was no conventional subrogation, since the evidence does not show a written subrogation by the bank to the surety company of the rights of the bank against Johnson, the surety was none the less fully subrogated to those rights against Johnson, because, by again referring to that foundation stone of Louisiana law, the Civil Code, we find that in article 2161 it is provided:

"Subrogation takes place of right: * * * "3. For the benefit of him, who, being bound with others, or for others, for the payment of the debt, had an interest in discharging it."

The surety (United States Fidelity & Guaranty Company) was bound with another (Johnson) for the payment of the debt created by Johnson when he stole the money. Thus, when the surety paid the debt it was subrogated as a matter of right to the claim of the bank against Johnson. If the surety thus obtained a claim against Johnson and the right to sue him civilly for the enforcement of that claim, its forbearance in the exercise of its said rights was full and complete consideration for the contract which is herein sued on, because our Supreme Court has said, in Commercial National Bank v. Richardson, 163 La. 933, 113 So. 152, 154:

"Moreover, under our law, 'a debt due by another is a sufficient consideration to support the promise of a third person to pay it.' "

Also, in Flood v. Thomas, 5 Mart. (N. S.) 560, we find:

"The debt of another is a sufficient consideration to support a contract of surety, or a promise to pay it."

Again, in New Orleans & Carrollton R. R. v. Chapman, 8 La. Ann. 97, the Supreme Court said:

"To make a contract of this nature, a promise to pay the debt of another, valid, it is only requisite to show the pre-existence of the debt which one has promised to pay to him who is the creditor. This is the pact constitutae pecuniae and requires no further consideration or foundation than the original debt. Pothier, Traite des Obligations, 1st vol., p. 367, 'Du Pact Constitutae Pecuniae.' "

Thus one of the considerations which the defendant, along with the other signers of the contract, received, was the temporary forbearance of the surety company. The debt of Johnson was sufficient considera-

tion to support the agreement of his friends to pay that debt in the future on condition that for the present no civil action would be resorted to.

An attack on this reasoning is based on the contention which I have already discussed, that the surety company was not a surety at all, but was in fact an insurer, and that, thus, subrogation did not take place as a matter of right, but could result only from a conventional assignment and that, since the record does not show a conventional assignment, no right in the surety against Johnson appears.

My answer to this is that where one person having in view a particular person or a particular group of persons agrees to stand responsible for their actions, that first person is a surety or guarantor of the actions of that other, or those other persons.

But I am of opinion that defendant here cannot raise the question as to whether or not Johnson became indebted to the surety when the surety paid the bank. Having agreed by his solemn obligation, together with the others, that, if the surety would pay the bank, they would pay the surety, can he now raise the question that no subrogation took place under which the surety could have sued Johnson? By the very terms of the agreement it appears that the surety could have sued Johnson and it was in order to avoid that result that they entered into the agreement. It would be monstrous to allow them, having agreed that the surety could sue Johnson, to now contend that that is not a fact. When that agreement was entered into no question was raised as to the fact of the payment by the surety company to the bank. The whole tenor of the agreement shows that it was understood that, as soon as the payment was made by the surety to the bank, the surety had the right to sue Johnson. I cannot countenance an attempt by them now to dispute the right of the surety against Johnson and, as I have already said, the existence of that right against Johnson was full consideration for the agreement by Johnson's friends to pay his debt and discharge his obligation.

I feel that where parties, by their solemn contracts, undertake obligations, the law does not and should not favor the abrogation of those contracts on purely technical grounds, and that those contracts should be enforced, unless to do so would do violence to real justice or to legal principles. Here no such result would follow a decree requiring that defendant do what he deliberately and solemnly agreed to do.

I respectfully dissent.